IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LANCE L. SWICK,                      )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        No. 1:10-cv-303
                                     )
JAMES WILDE; RANDI MASON; LEO        )
VEREEN; CHRISTOPHER BLUE; and        )
THE TOWN OF CHAPEL HILL, NORTH       )
CAROLINA,                            )
                                     )
                Defendants.          )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

        Plaintiff Lance L. Swick ("Swick") brings suit against
Chapel Hill police officers James Wilde ("Wilde") and Randi
Mason ("Mason"), police department supervisors Lieutenant Leo
Vereen ("Vereen") and Captain Christopher Blue ("Blue"), and the
Town of Chapel Hill, North Carolina (also "Town") (collectively,
the "Defendants") on the grounds they allegedly violated his
rights under the federal Constitution and the constitution and
laws of the state of North Carolina by obtaining warrants for
Swick's arrest on two separate occasions in May 2007. (Doc. 1.)
Before the court is Defendants' motion for summary judgment as
to all seventeen claims. (Doc. 26.) Because Swick has
identified genuine disputes of material fact as to five claims,
Defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

Taken in a light most favorable to Swick, as the nonmoving party, the evidence reveals the following:

Swick is a neurobiologist who works at a research laboratory in Durham, North Carolina, and, during the time-period relevant to this case, lived in an apartment complex in Chapel Hill known as 82 Magnolia. (Doc. 26-1 (Swick Deposition ("Dep.")) at 8, 11, 65-66.)[1] The apartment complex had a lively social scene that sprung up around the complex's pool. (Id. at 64.) Swick occasionally organized pool-side parties himself, and during those events he became acquainted with some of the complex's other residents, including Mason, a Chapel Hill police officer. (Id. at 75-76, 96.)

Over time, Mason and Swick became "very good friends." (Id. at 71.) Swick routinely invited Mason to the parties he hosted at the pool and his apartment. (Id. at 78.) Swick also introduced Mason to a friend of his, Tim Runfola ("Runfola"), whom she dated for "some period of time." (Id. at 76-77.) At some point thereafter, however, Mason began dating fellow Chapel Hill police officer Wilde, and Mason, who eventually arranged for Wilde to stay with her (and whom she later married), started

---

[1] The original pagination of the depositions and trial testimony does not always correspond with that of the court exhibits. Where possible, the court cites to the original pagination throughout this opinion.

to distance herself from the social scene at 82 Magnolia. (Id. at 76.)

Against this personal backdrop, three events occurred that precipitated the present lawsuit. First, on January 20, 2007, Mason was patrolling in downtown Chapel Hill when she noticed Swick's Ford Mustang GT automobile parked in a lot along one of the Town's busiest streets. (Doc. 26-3 (Mason Dep.) at 100.) Mason believed that Swick's license had been revoked[2] and advised other officers to "be on the look out [sic] for [Swick's] vehicle," indicating that its driver had a "possible revoked license." (Doc. 26-4 at 101, 103.) Later that evening, Wilde, who was also on duty at the time, observed Swick's vehicle traveling at 45 miles-per-hour in a 35 miles-per-hour zone as it left downtown Chapel Hill. (Doc. 26-5 (Wilde Dep.) at 57.) Wilde initiated a traffic stop of the Mustang, discovered that Swick was the driver, and smelled the odor of alcohol on Swick's breath. (Id. at 57-58, 64.) Wilde engaged Swick in several field sobriety tests and concluded that Swick performed "poorly." (Id. at 63.) As a result, Wilde arrested Swick for driving while intoxicated, speeding, and driving with a revoked

---

[2] Mason states that she believed Swick's license was revoked because he informed her during their first meeting that he did not have a license and, as a joke, asked her not to arrest him if she saw him driving. (Doc. 26-4 at 102.) Swick denies making any statement to Mason about the status of his license. (Doc. 26-1 at 67.)

license.[3]  (Id. at 67-68.)  Swick pleaded guilty in March 2008 to driving while impaired.  (Doc. 26-1 at 50-51.)

The second precipitating event occurred on the evening of May 20, 2007.  At approximately 11:00 p.m., Mason and Wilde were walking their dog around the parking lot of 82 Magnolia as Mason performed a security check of the complex in her capacity as a "courtesy" officer for the apartments, when they heard the sound of jingling keys coming from the direction of Swick's apartment building.  (Doc. 26-3 at 73.)  Mason and Wilde stopped and observed a man they believed to be Swick exit the building, cross into a garage,[4] and get into a silver vehicle at the driver's door.  (Id.)  When the vehicle began to drive away, Mason followed it on foot and observed it leave the apartment complex parking lot and drive onto a roadway.  (Id.)  Mason, who knew about Swick's prior DWI arrest (id. at 92), believed that Swick's license may have been revoked, so she called Orange County Communications, the Chapel Hill police force's central dispatch center, to determine the status of Swick's license (id.

_____

[3] Wilde had run Swick's license plate number through a computerized database during the January 20, 2007 incident and determined that Swick's driver's license was, in fact, revoked.  (Doc. 26-5 at 51-52.) Swick had been convicted in 2006 of driving while intoxicated in Wake County, North Carolina.  (Doc. 26-1 at 39.)

[4] Swick indicates that although he did not rent a garage from his landlord, his friend Carlos Alvarado, who was a maintenance technician at 82 Magnolia, permitted him to park in a garage across from Swick's building.  (Doc. 26-1 at 68-69; see also Doc. 27-2 (Alvarado Dep.) at 34-35.)

4

at 78).  The communications operator informed Mason that Swick's license had been revoked.  (Id. at 78, 89.)  As a result, Mason swore out a warrant for Swick's arrest (id. at 95), which was issued by Orange County Magistrate John Stokes after he determined that probable cause existed to charge Swick for driving while his license was revoked (Doc. 27-7 at 1).

Swick, for his part, is unsure about the status of his license on May 20, 2007.  (Doc. 26-1 at 85.)  Nevertheless, he contends that he did not drive a car that evening.  (Id. at 86.) Instead, he states that he was listening to a band at Broad Street Café in Durham.[5]  (Id.)  When police officers served Swick with the warrant later in the week, he turned himself in and retained counsel to challenge the arrest.[6]  (Id. at 89-90.)

Finally, on May 27, 2007 -- just one week after Mason obtained the warrant for Swick's arrest and several days after Swick had turned himself in to police -- Swick and several of his friends were celebrating Memorial Day weekend at the 82 Magnolia pool.  (Id. at 95.)  Wilde arrived home from work and, although still on duty, took his "fitness break" by deciding to

---

[5] For purposes of this motion, the court assumes that Swick was not, in fact, driving the vehicle that Mason and Wilde observed.

[6] Ultimately, the driving while license revoked charge against Swick was dismissed.  (Doc. 26-1 at 91.)

go swimming.[7]   (Doc. 26-5 at 77.)   Runfola heard someone say, "Oh, James [Wilde] is here" and informed Swick.  (Doc. 27-4 at 45.)  Swick in turn pointed to Wilde in the pool, who now was standing and looking at the group, and said, "He's right there." (Id. at 48.)

Swick had been drinking throughout the day (Doc. 26-1 at 97), and, upon learning about Wilde's presence at the pool, he indicated to his friends that he would like to speak with Wilde about the "thought process" that went into issuing him the May 20 arrest warrant.  (Doc. 26-2 at 106-07, 117.)  Swick's friend, Runfola, told Swick that he did not believe confronting Wilde was "a very good idea" and instead offered to speak with Wilde himself.  (Id. at 117-18.)

While these discussions were taking place, Wilde, who was swimming in the pool, observed Swick speaking with several friends, heard someone refer to him,[8] and became uncomfortable and decided to leave.  (Doc. 26-5 at 81-82.)  Runfola, dressed in shorts, t-shirt and flip-flops, followed Wilde out of the pool area, and Swick, dressed in a swim suit and flip-flops, and friends, Deepak Gopalakrishna ("Gopalakrishna"), Carlos Alvarado ("Alvarado"), and Jason Downey ("Downey"), also dressed in pool

---

[7] According to Wilde, Chapel Hill permits its police officers "a one-hour time to go do something for [their] fitness level."  (Doc. 26-5 at 77.)  Thus, Wilde was on duty at the time of the incident.  (Id.)

[8] According to Wilde, one of them said, "that pussy there."  (Doc. 26-5 at 81.)  All other witnesses deny having said or heard this.

garb, filed out shortly thereafter. (Doc. 26-2 at 125-26; Doc. 28-3 at 220.) The five men trailed Wilde, at varying distances from each other, outside the pool area, across a traffic round-about that divided the complex, and into an adjoining parking lot, a distance of approximately 100 yards; but, before any of them could speak to Wilde, Wilde got into his vehicle and drove away. (Doc. 26-2 at 127.) Wilde says he believed the five men were following him. (Doc. 26-5 at 85.)

After driving out of the apartment complex, Wilde decided that he may have overreacted, and a few moments later he chose to return to his apartment. (Id. at 87.) When he pulled into the complex, Wilde initially did not see Swick or his friends. (Id.) However, Swick had been talking to two of his neighbors by the complex's trash compactor, and when he saw Wilde drive up, he decided to confront him. (Doc. 26-2 at 158-59; Doc. 26-5 at 88.) As Wilde pulled into his parking space, Swick approached him to "clear the air." (Doc. 26-2 at 129-30.) By this time, Wilde was gathering his police gear from his trunk. (Doc. 26-5 at 87-88.)

According to Swick, he asked Wilde if he could talk to him, and Wilde answered, "Yes, what do you want, Lance?" (Doc. 28-3 at 211.) Swick asked, "Why are we doing this, James?" "Is there something I did to you?" and "Why are you throwing me under the bus?" (Doc. 26-2 at 130.) Swick also asked why Wilde was

7

charging him "with these charges" and said that "it appeared that you guys [Mason and Wilde] . . . were targeting me in a way and trying to throw me under the bus." (Doc. 28-3 at 211; see also Doc. 26-2 at 156.) At one point, Wilde responded, "well, stop breaking the law and you won't -- you know -- we won't be charging you." (Doc. 28-3 at 211-12.) Wilde also said he was sensitive to DWI situations because he had a friend who was hurt in a DWI accident. (Id. at 212.) During the course of the conversation, Wilde grabbed his helmet from the trunk and moved to the side of his car, placing his back to the vehicle. (Doc. 28-2 at 144.)

During the discussion, the two men never raised their voices, nor did either show their fists or make any threatening statements. (Doc. 26-2 at 129; Doc. 26-5 at 89.) Swick's four friends were present while the conversation took place. (Doc. 26-2 at 107, 131-32.) Alvarado, Downey, and Gopalakrishna stood around a tree some 50 or more feet away, while Runfola sat "on the curb across the parking lot."[9] (Id. at 132.) Swick contends, and his friends at the scene agree, that the conversation was "polite" and "calm," although he acknowledges that Wilde appeared to be "a little agitated" by the end of the encounter. (Id. at 129; Doc. 28-3 at 211, 219.)

---

[9] According to Wilde, the men cut off an "escape route to [his] house." (Doc. 26-5 at 89.)

Wilde ultimately terminated the conversation by telling Swick that he did not want to speak with him anymore. (Doc. 26-5 at 97.) At that point, Swick acquiesced, saying, "Okay." (Id.; Doc. 27-4 at 68.) Wilde gathered his gear, which included his service firearm (in a carrying case), and walked to his apartment. (Doc. 26-5 at 87-88; Doc. 27-4 (Runfola Dep.) at 63.) In doing so, he walked around another vehicle to avoid Runfola, who was seated on the sidewalk between Wilde's car -- where the conversation had taken place -- and Wilde's apartment. (Doc. 26-5 at 98.)

When Wilde returned to his apartment, he contacted one of his supervisors at the police department, Lieutenant Vereen, and told him about the incident. (Id. at 100; Doc. 26-6 at 101.) Later that evening, Captain Blue, another supervisor at the Chapel Hill police department, called Wilde and told him that Vereen had spoken about the situation with a magistrate who indicated there was enough evidence to take out a charge against Swick for intimidating a witness. (Doc. 26-6 at 102-03; see also Doc. 26-7 (Vereen Dep.) at 45.) Vereen was particularly concerned because one of Swick's friends who followed Wilde out of the pool, Alvarado, was the maintenance supervisor at 82 Magnolia and potentially had access to the keys to the apartment Wilde and Mason shared and where the officers kept their firearms. (Doc. 26-6 at 103-04.)

9

The next morning Wilde appeared before a magistrate to determine whether there was probable cause for an arrest.[10] Wilde told the magistrate that several men had "followed" him, "surrounded" him, and "fanned out" to "prevent [him] from leaving" while Swick engaged him in a conversation. (Id. at 108.) Wilde further explained that Swick asked Wilde why he "would ever charge [Swick] with stuff" and why he was being "thrown under the bus." (Id.) Wilde also told the magistrate that the conversation ended when he walked away and that he was "unmolested" as he returned to his apartment. (Id. at 109.) Based on that information,[11] Magistrate J.A. Tompkins issued a

---

[10] The warrant issued on May 28, 2007, lists "L. Vereen (Chapel Hill PD)" as the complainant. (Doc. 27-7 at 3.) However, Wilde says that he was the person who reported the incident to the magistrate on May 28 (Doc. 26-6 at 107-08), and Vereen testified that he did not participate in obtaining the warrant that day (Doc. 26-7 at 48). Drawing the evidence in Swick's favor, it appears that Wilde was the officer who initiated the warrant against him.

[11] The magistrate found probable cause to believe that Swick

> willfully did threaten to physically injury the person of J B WILDE. The threat was communicated to J B WILDE by BODY LANGUAGE and the threat was made in a manner and under circumstances which would cause a reasonable person to believe that the threat was likely to be carried out and the person threatened believed that the threat would be carried out.

(Doc. 27-7 at 3.) He also found probable cause to believe that Swick

> willfully and feloniously did by threats attempt to intimidate J B WILDE, who was acting as a witness in ORANGE COUNTY DISTRICT COURT IMPARED [sic] DRIVING CASE NUMBER 07CR 050397. The intimidation consisted of THREATENING BODY LANGUAGE, STATEMENTS AS TO WHY THE POLICE WERE OUT TO GET HIM, WHY HE WAS BEING THROWN UNDER THE TRAIN, WHY ARE YOU TARGETING ME and

10

warrant for Swick's arrest for communicating threats and feloniously intimidating a witness. (Doc. 27-7 at 3.)

The warrant was served on Swick a little later, and he turned himself in at the police station. (Doc. 26-2 at 139.) At the time the warrant was issued, Swick's employer was negotiating to obtain a security clearance related to government contracts.[12] (Doc. 26-1 at 19.) According to Swick, his pending criminal charge put the company's security clearance in jeopardy and, as a result, he was demoted from a vice president position to a director. (Id. at 19-20.) The demotion apparently had no effect on Swick's income. (Id. at 46.)

The communicating threats charge was subsequently dismissed prior to trial, and following a trial in May 2008, Swick was found not guilty on the charge of feloniously intimidating a witness (as well as on the lesser included charge of misdemeanor attempting to obstruct justice). (Doc. 28-4 at 364.)

Nearly two years later, on April 20, 2010, Swick initiated this action by filing an eighty-six-page complaint, alleging seventeen separate causes of action. (Doc. 1.) Swick brings

---

was for the purpose of CREATING FEAR IN THE OFFICER AND TRYING TO GET HIM TO DROP ALL CHARGES.

(Id.)

[12] Swick's employer "officially" hired him in July 2007. (Doc. 26-1 at 14.) Swick maintains that when his employer learned of the charges against him, he was "demoted." (Id. at 19-20.)

the majority of his claims under 42 U.S.C. § 1983 and alleges that Defendants violated his constitutional rights by procuring and issuing warrants for his arrests on May 20, 2007 (for driving while his license was revoked) and on May 27, 2007 (for communicating threats and intimidating a witness).[13] Swick also raises claims under North Carolina statutory, constitutional, and common law arising from the same events.[14]

After conducting discovery, Defendants moved for summary judgment on each of Swick's claims. (Doc. 26.) The matter has been briefed and is, therefore, ripe for the court's review. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

## II. ANALYSIS

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no

---

[13] Swick's federal claims allege (1) unreasonable seizure in violation of the Fourth and Fourteenth amendments, (2) criminalizing speech in violation of the First Amendment, (3) retaliation in violation of the First, Fourth, and Fourteenth amendments, (4) fabrication of evidence in violation of the Fourth and Fourteenth amendments, (5) concealment of evidence is violation of the Sixth and Fourteenth amendments, (6) bystander officers' failure to intervene in violation of the Fourteenth Amendment, (7) municipal liability, (8) supervisory liability, and (9) conspiracy -- all in violation of 42 U.S.C. § 1983.

[14] Swick alleges that the Defendants engaged in (10) malicious prosecution and conspiracy, (11) obstruction of public justice and conspiracy, (12) intentional infliction of emotional distress and conspiracy, (13) negligence, (14) negligent hiring and retention, (15) negligent supervision, discipline, and training, (16) negligent infliction of emotional distress, and (17) violations of the North Carolina Constitution.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." T-Mobile Northeast LLC v. City Council of Newport News, 674 F.3d 380, 385 (4th Cir. 2012). "[T]he party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine [dispute] of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). When assessing a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any," Boitnott v. Corning Inc., 669 F.3d 172, 175 (4th Cir. 2012), but it views all facts and draws all reasonable inferences therefrom "in the light most favorable to the nonmoving party," Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 434 (4th Cir.), cert. denied, 132 S. Ct. 575 (2011). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

The parties tackle Swick's lengthy complaint by dividing its causes of action into two categories: its federal claims and its state-law claims. The court follows their convention.

13

### A. Federal Claims

#### 1. Parties' Arguments

As to each of Swick's nine federal claims arising under 42 U.S.C. § 1983, Defendants argue that in order for Swick to prevail, he must be able to demonstrate that he was arrested without probable cause. (Doc. 29 at 15 (citing <u>Brown v. Gilmore</u>, 278 F.3d 362, 367-68 (4th Cir. 2002)).) Defendants contend that such a showing would be impossible because probable cause existed for Swick's arrests for driving while his license was revoked on May 20, 2007, and for communicating threats and intimidating a witness on May 27, 2007. (<u>Id.</u> at 16-17.) According to Defendants, even assuming that Wilde and Mason were mistaken about the identity of the man they saw driving the silver vehicle on the evening of May 20, the officers were justified in believing that a man leaving Swick's apartment building, entering a garage occasionally used by Swick, and driving away in a vehicle, created probable cause for an arrest of Swick, especially in light of the fact that Mason confirmed that Swick's license remained revoked at the time of the incident. (<u>Id.</u> at 16.) In addition, Defendants contend that Wilde had probable cause to arrest Swick on May 27 because of Swick's threatening conduct and confrontational manner -- all while Swick knew that Wilde would be a witness against him on

the January 20, 2007 DWI and May 20, 2007 driving without a license charges. (Id. at 17.)

Defendants also note that their position is strengthened by the fact that both officers Mason and Wilde obtained arrest warrants from neutral magistrates rather than simply conducting arrests based on their own observations. (Id. at 17 & n.6 (citing Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991)).) As Defendants put it, the doctrine of qualified immunity insulates Mason's and Wilde's arrests even in the absence of probable cause because the arrest warrants were not "'so lacking in indicia of probable cause as to render official belief in its existence unreasonable'" -- the standard, they contend, that applies to wrongful arrest claims against police officers where magistrates issue the arrest warrants. (Id. at 18 (quoting Torchinsky, 942 F.2d at 261).) Finally, Defendants contend that many of Swick's other federal law claims fail as a matter of law for alternative reasons. (Id. at 18-24.)

Swick, on the other hand, argues that probable cause did not exist for either of his arrests at issue. On May 20, he explains, he was miles away from his apartment complex when Mason and Wilde claim to have seen him enter the silver car. (Doc. 32 at 13.) Moreover, Swick points out that his car -- a Mustang -- was impounded at the time of the arrest and that Mason and Wilde knew that, making it unreasonable for them to

suspect that he was the silver car's driver. (Id. at 14.)
Finally, Swick contests Mason's statement that she confirmed
that his license was revoked at the time of the arrest; North
Carolina's Department of Motor Vehicles records, he contends,
demonstrate that his license was not revoked at that time. (Id.
at 14-15.)

As for the May 27 arrest for intimidating a witness, Swick
argues that a genuine dispute of material fact exists over
whether his arrest was supported by probable cause. (Id. at 7.)
Swick points out that Wilde admitted that no threat was made
against him, and since the term "threat" is synonymous with
"menace" and "coerce," Swick did not engage in those actions,
either. (Id.) Swick contends that there is a genuine dispute
about where his friends stood at the time of his confrontation
with Wilde – denying that they "fanned out" and "surrounded"
Wilde to "cut off his escape," as Wilde claimed -- and,
moreover, that there is no evidence demonstrating that Swick was
motivated by a specific intent to intimidate Wilde. (Id. at 7-
9.) Swick also contests whether probable cause existed for the
charge of communicating threats and disputes a number of
Defendants' factual characterizations.

### 2. Qualified Immunity

The doctrine of qualified immunity protects police officers
and other public officials from liability for constitutional

violations under 42 U.S.C. § 1983 "for reasonable mistakes as to the legality of their actions."  Merchant v. Bauer, 677 F.3d 656, 661 (4th Cir. 2012) (citation omitted).  When public official defendants assert qualified immunity, as Defendants do here, the court must consider two questions.  First, it must determine whether the facts a plaintiff has shown "make out a violation of a constitutional right."  Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Second, the court must decide "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id. (citing Saucier, 533 U.S. at 201).  The answer to both questions "must be in the affirmative in order for a plaintiff to defeat a defendant police officer's motion for summary judgment on qualified immunity grounds." Miller v. Prince George's Cnty., 475 F.3d 621, 627 (4th Cir. 2007) (citation omitted).  A court may address the questions in either order.  Pearson, 555 U.S. at 236.

Qualified immunity "is an affirmative defense that must be pleaded by a defendant official."  Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982).  Because qualified immunity only protects actions within the scope of a law enforcement officer's discretionary authority, "the defendant bears the initial burden of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties."

17

_Henry v. Purnell_, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (citation and internal quotation marks omitted). Once the defendant properly asserts qualified immunity, "[t]he plaintiff bears the burden of proof on the . . . question [of] whether a constitutional violation occurred." _Id._ at 377. If the plaintiff meets his burden, the defendant then bears the burden of proof on the question of whether the right in question was clearly established at the time of the alleged misconduct. _See id._ at 378.

Here, Swick does not challenge Defendants' threshold assertion of qualified immunity (i.e., that the actions complained of fell within the scope of Wilde's and Mason's official duties). _See id._ at 377 & n.2 (noting that the plaintiff did not challenge the defendant's initial "assertion of the qualified immunity defense" and proceeding to determine whether the plaintiff had demonstrated the existence of a constitutional violation). Thus, the initial question for the court is whether Swick has created a genuine dispute of material fact as to whether Defendants violated a constitutional right with respect to the May 20 or 27 arrests.

### a. Violation of a Constitutional Right

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. The

18

prohibition against unreasonable seizures protects individuals from being seized in the absence of probable cause. Miller, 475 F.3d at 627; see also Malley v. Briggs, 475 U.S. 335, 340-41 (1986). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Generally speaking, a police officer may rely on a magistrate's determination that probable cause exists for an arrest. See Torchinsky, 942 F.2d at 262 ("When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983.")

Here, Swick challenges Defendants' assertion of qualified immunity as to both the May 20 and 27 arrests. Because each arrest was a different incident based on its own facts, the court addresses whether a constitutional violation occurred in either (or both) of them separately.

### i. May 20 Arrest

Swick's first argument challenging Defendants' qualified immunity defense is that Mason arrested him without probable cause on the evening of May 20, 2007. Probable cause to justify an arrest exists when the facts within an officer's knowledge "are sufficient to warrant a prudent person . . . in believing,

19

in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998) (citation and internal quotation marks omitted). "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (en banc). In the absence of factual disputes, the determination of probable cause is a question of law. United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996).

Taking the evidence in the light most favorable to Swick, it is evident that a reasonable officer in Mason's position would have had probable cause to believe Swick was driving with a revoked license. North Carolina law makes it a Class 1 misdemeanor for "any person whose drivers license has been revoked [to] drive[] any motor vehicle upon the highways of the State while the license is revoked." N.C. Gen. Stat. § 20-28(a). Here, Mason knew that Swick had been involved in a prior arrest for driving while under the influence of alcohol (Doc. 26-3 at 92) and that his license would have been revoked for that charge, see N.C. Gen. Stat. § 20-16.5(f), (h) (requiring at least a thirty-day revocation of a person's drivers' license where a person is charged with driving while under the influence of alcohol). On the evening of May 20, she saw a man she identified as Swick (based on her past friendship with him)

leave his apartment building and enter the driver's-side door of a silver vehicle. (Id. at 73, 90.) Mason was certain that the man she and Wilde saw was Swick. (Id. at 73.) Mason observed the silver vehicle leave the complex's parking lot and enter a public road. (Id.) She then called Orange County Communications and determined that Swick's license was, in fact, revoked. (Id. at 78.) Only then -- after determining that a man she believed to be Swick had driven on a public road while his license was revoked -- did she swear out a warrant for his arrest. (Id. at 95.) These facts, viewed objectively, established probable cause for Swick's arrest.

Swick challenges this conclusion on three principal grounds. First, he contends that probable cause was lacking because he was not the person driving the vehicle that Mason and Wilde observed on May 20 at 82 Magnolia. (Doc. 32 at 13.) Yet even assuming that Mason was mistaken about the identity of the man she saw leaving Swick's apartment, her mistake is not so egregious as to remove the shield of immunity. The Supreme Court has explained that "an officer's reasonable misidentification of a person does not invalidate a valid arrest." Maryland v. Garrison, 480 U.S. 79, 87-88 (1987). Mason saw a man she identified as identical to her friend Swick leave his apartment building, enter into a garage, and drive away in a silver vehicle. (Doc. 26-3 at 73.) Under these

circumstances, it was "sufficient[ly] probab[le]" that the man she saw was Swick and that even if she was wrong her "mistake was understandable and the arrest [was] a reasonable response to the situation facing [her] at the time." Hill v. California, 401 U.S. 797, 803 (1971); see also Gary v. Floyd, 582 F. Supp. 2d 741, 746 (D.S.C. 2007) (explaining that "allegations of negligence or innocent mistake by a police officer will not provide a basis for a constitutional violation") (citation omitted).

Second, Swick contends that Mason's statement that his driving privileges were revoked at the time of the arrest is false. (Doc. 32 at 14-15.) According to Swick, evidence introduced at the criminal trial against him (which he has not cited here) revealed that his license was valid on May 20. He also contends that even if his license had been revoked for a traffic violation, the period of revocation for driving while impaired is only thirty days. (Doc. 32 at 14-16.) In his view, therefore, it was unreasonable for Mason to believe on May 20 that his license was still revoked (either as a result of his March 20, 2006 conviction, or his January 20, 2007 arrest, for DWI).

Swick's contentions are without merit. Assuming for the sake of argument that he was eligible to have his license returned thirty days after either his March 20, 2006 conviction,

or his January 20, 2007 arrest, North Carolina law makes clear that his license would not necessarily have been restored within that time. See N.C. Gen. Stat. § 20-16.5(h). Indeed, only if Swick applied to the clerk of court and paid the statutorily required $100 fee or if a magistrate ordered the revocation rescinded would Swick's license have been restored on May 20. Id. § 20-16.5(h), (j). Thus, contrary to Swick's argument, Mason could not have known that Swick had a valid license simply because thirty days had passed from his most recent traffic arrest. In addition, Swick has presented no evidence that he in fact had a valid license on May 20; Mason, on the other hand, has sworn that she received information that Swick's license was revoked on that date. In such circumstances, the court "refuse[s] to permit mere conjecture to upset the normal presumptions surrounding a warrant's validity." Torchinsky, 942 F.2d at 262.

Finally, Swick argues that it was unreasonable for Mason to believe that Swick was the driver of the silver vehicle because she knew that his car, the Mustang, was impounded at the time. (Doc. 32 at 14.) But this fact is insufficient to preclude a finding of probable cause. It could be equally argued that Mason's knowledge that Swick's Mustang was impounded makes it more, rather than less, reasonable for her to conclude that

Swick would be driving a different car -- perhaps one that he rented or borrowed from someone else -- on May 20.

Where, as here, an arrest is based on probable cause, it cannot result in a constitutional violation. McKinney v. Richland Cnty. Sheriff's Dep't, 431 F.3d 415, 418 (4th Cir. 2005). And in the absence of a constitutional violation, qualified immunity applies[15] and the court need not address whether the constitutional right in question was clearly established. Id.; LeSueur-Richmond Slate Corp. v. Fehrer, 666 F.3d 261, 269 (4th Cir. 2012). Accordingly, Defendants are entitled to summary judgment as to any claims stemming from the May 20 warrant for Swick's arrest.

### ii. May 27 Arrest

Swick also challenges Defendants' assertion of qualified immunity for his May 27 arrest and subsequent prosecution for communicating threats and intimidating a witness, contending that Wilde lacked probable cause for an arrest on either ground. If probable cause exists for arrest on either -- or any -- ground, Swick's claims related to his May 27 arrest will fail. Jaegly v. Couch, 439 F.3d 149, 153-54 (2d Cir. 2006); see also Devenpeck, 543 U.S. at 152-53 (holding that the reasons invoked

---

[15] There is support for the position that in the absence of a constitutional violation, a defendant prevails not because of qualified immunity but because the plaintiff has failed to demonstrate an essential element of a section 1983 claim. See Purnell, 501 F.3d at 378 n.3. In any event, the result is the same here.

by the arresting officer do not constrain the validity of an
arrest).

### 1. Communicating Threat Charge

A person is guilty of communicating threats under North
Carolina law when he willfully threatens to physically injure a
person, the person's family, or the person's property;
communicates the threat to that person; and makes the threat in
such a manner and under such circumstances that a reasonable
person would believe, and the threatened person actually did
believe, the threat was likely to be carried out. N.C. Gen.
Stat. § 14-277.1; State v. Cunningham, 344 N.C. 341, 360-61, 474
S.E.2d 772, 781 (1996) (citing a prior version of section 14-
277.1). No party has identified a definition of "threat" under
North Carolina law. The American Heritage Dictionary defines
"threat" in part as "[a]n expression of an intention to inflict
pain, harm, or punishment." American Heritage Dictionary (5th
ed. 2011). North Carolina courts have repeatedly held that the
crime of communicating threats "involve[s] threats clearly
stating what the speaker intended to do." See, e.g., State v.
Mortimer, 142 N.C. App. 321, 324, 542 S.E.2d 330, 332 (2001)
(citing cases).

Here, the undisputed facts reveal that Swick simply
discussed the May 20 arrest warrant with Wilde (ostensibly in an
attempt to "clear the air"). (Doc. 26-2 at 116.) Swick began

25

the conversation by asking if he could speak with Wilde. (Doc. 26-5 at 90.) The witnesses agree that Wilde and Swick conversed on a first-name basis, were calm throughout the conversation, and did not raise their voices. (Doc. 27-2 at 61; Doc. 27-4 at 69.) In addition, neither man displayed any threatening gesture. (Doc. 27-4 at 69.) Wilde also concedes that none of Swick's statements could be construed as threatening.[16] (Doc. 26-5 at 89, 92.) Finally, Wilde admits that when he decided to end the conversation, no one attempted to, or did, prevent him from leaving (although Wilde claims he felt he had to walk around Runfola, who was seated on or near the sidewalk) and that he was able to return to his apartment unaccosted. (Doc. 26-5 at 97-98.)

Under Swick's version of the evidence, after Wilde was spotted in the pool, Swick and his friends (some of whom were also Wilde's friends or acquaintances) followed Wilde out of the pool area and across the street, when Wilde drove off. Once Wilde returned, none of the other men was closer than 15 or 20 feet (and perhaps as far as 75 feet) from Wilde and Swick as

_____

[16] According to Wilde's deposition, "[t]he only thing that would even [be] classified [as threatening] is when" Wilde mentioned to Swick that another police officer (identified as Chris Gilliam) had seen Swick driving on either January 20 or May 20, and in response Alvarado "yelled out something about, oh, yeah, '[N]ow Chris is involved in this, too.'" (Doc. 26-5 at 92.) No one contends that this statement is threatening and, even if it somehow could be construed as such, Swick did not make it.

Swick attempted to inquire about the charges against him (one of which, the May 20 charge, was brought by Wilde's girlfriend, Mason). There was no verbal threat, and Swick's rendition of the physical arrangement of the men -- all of whom were in swim attire and either wore flip flops or were barefoot -- would indicate that they kept their distance under a tree (to avoid walking on the hot parking lot pavement) and thus did not reasonably represent a threat of any physical harm. Cf. State v. Thompson, 157 N.C. App. 638, 645, 580 S.E.2d 9, 14 (2003) (explaining that the "gravamen of communicating threats is the making and communicating of a threat"). Consequently, the court cannot say, based on the disputed evidence, that Wilde had probable cause as a matter of law to arrest Swick for communicating threats.

### 2. Witness Intimidation Charge

A person commits the felony offense of intimidating a witness when he "by threats, menaces or in any other manner intimidate[s] or attempt[s] to intimidate any person who is summoned or acting as a witness in any of the courts" of the state of North Carolina "or prevent[s] or deter[s], or attempt[s] to prevent or deter any person summoned or acting as such witness from attendance upon such court." N.C. Gen. Stat. § 14-226(a); State v. Braxton, 183 N.C. App. 36, 43, 643 S.E.2d 637, 642 (2007). The North Carolina Court of Appeals has

27

construed the word "intimidate" to mean "'to make timid or fearful[,]' 'inspire or affect with fear[,]' and 'to compel action or inaction (as by threats)[.]'" St. John v. Brantley, --- N.C. App. ---, ---, 720 S.E.2d 754, 759 (2011) (alterations in original) (quoting Webster's Third New International Dictionary (unabridged 2002)) (assessing the validity of a civil no-contact order based on witness intimidation in violation of section 14-226(a)). North Carolina's courts have found a witness-intimidation charge unsupported where the defendant's statement "nowhere hints at bodily harm or violence . . ., contains no cursing, vulgarity or threatening language, and maintains a courteous tone throughout." State v. Williams, 186 N.C. App. 233, 239, 650 S.E.2d 607, 611 (2007). In addition, the State's courts have rejected charges of witness intimidation where, in the absence of any threatening statement, the "defendant specifically encouraged [the witness] to dismiss the charges against him, to not show up in court, and to write an affidavit to the District Attorney saying that she made everything up and that the charges were false." Braxton, 183 N.C. App. at 44, 643 S.E.2d at 643. Wilde has not cited any case where a witness intimidation charge was permitted in the absence of some threat of harm.

The court has already determined that it cannot conclude as a matter of law on this record that Swick communicated a threat

to Wilde. However, while the arrest warrant relied on the "threat" prong of the statute, the court may nevertheless find the arrest constitutional if it is supported on any basis. Devenpeck, 543 U.S. at 152-53. Therefore, the focus for the intimidation (or attempt) charge turns to the "in any other manner" portion of the statute and the behavior of Swick and his friends during the incident.

Under Wilde's version of events, Swick singled him out in the pool while someone referred to him derogatorily as "that pussy." (Doc. 26-5 at 81.) This caused Wilde to become uncomfortable, so he left. Indeed, Wilde claims he was "pretty close to panicked" when he left the pool. (Doc. 26-6 at 133.) Swick and his friends then silently "followed" Wilde from the pool area, "approached" him, "fanned out" and "surrounded" him, and "cut off an escape route to [Wilde's] house." (Doc. 26-5 at 88-89.) Wilde says that Swick's friends were in "close proximity" to him and that, in his opinion, the men were "within earshot" of him and Swick. (Doc. 26-6 at 138-39.) Wilde's concern heightened such that he backed up to his car so as to protect from an attack from the rear. In addition to Swick's questions to Wilde noted previously (which are not disputed), Swick also allegedly said that he wanted to talk with Wilde "mano-a-mano" and said, "I really don't need this right now," in a tone that was "angry" and "bitter." (Id. at 140; Doc. 28-2 at

145, 150.)  In order to leave, Wilde contends, he had to walk around Runfola, who blocked his path toward his apartment.

Swick paints a very different scene.  He notes that he and at least two of the other men were friends and acquaintances of Wilde's: Swick was close friends with Mason, Wilde's girlfriend, who had previously introduced Swick to Wilde (Doc. 26-5 at 58); Runfola, a research technician at the University of North Carolina's neuroscience department, had dated Mason previously and was at least acquainted with Wilde (Doc. 26-6 at 139); and Alvarado, who was the maintenance technician at 82 Magnolia, considered Wilde "my friend" (Doc. 28-3 at 260).  He also notes that the pool environment was one of families and children swimming and celebrating the holiday weekend.  (Doc. 26-1 at 95-96; Doc. 28-3 at 246-47.)  Swick and some of his friends admit to identifying Wilde in the pool, but they all deny calling or hearing anyone refer to him in the derogatory manner claimed. (See, e.g., Doc. 26-2 at 114.)  Rather, Swick contends, he and Runfola simply followed Wilde from the pool to speak with him, and the other three men tagged along at a distance.  Swick expressly disputes the characterization that his friends "surrounded" Wilde.  Swick's friends testified that they stood, clad in swim suits, flip flops, and towels (Doc. 28-3 at 210-11), no closer than 15 to 20 feet from Wilde and Swick (Doc. 27-3 at 36-37) and perhaps much farther away (Doc. 27-2 at 61 (40-

50 feet); Doc. 27-4 at 67 (50-75 feet)) -- so far that some of them could not hear at least parts of the conversation (id.; Doc. 27-3 at 20). Under Swick's evidence, his three friends were standing behind him and Runfola was seated on the grass and sidewalk somewhere beyond the parking lot to Wilde's left. They describe the encounter as "calm" and "conversational." (Doc. 26-2 at 129; Doc. 28-3 at 223.) They say, and Wilde admits, they did not prevent Wilde from leaving and, in fact, on two separate occasions Wilde left on his own accord without encountering a word of resistance. (Doc. 26-5 at 86, 97-98.)

Despite these factual differences, Defendants first justify the May 27 arrest based on the North Carolina magistrate's determination that probable cause existed. To his credit, Wilde did not arrest Swick at the scene, reported the incident to his supervisor, and the next day presented his case to a magistrate. Wilde seeks "to corroborate his probable cause analysis by . . . relying on the magistrate's evaluation of his warrant application." See Merchant, 677 F.3d at 663. However, the magistrate's authorization of a warrant does not shield an officer from liability if a warrant application fails to show probable cause. See id. at 665; see also Messerschmidt v. Millender, --- U.S. ---, ---, 132 S. Ct. 1235, 1245 (2012) ("[U]nder our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional

search or seizure does not end the inquiry into objective reasonableness."). Moreover, "[t]he validity of [a] warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate." Garrison, 480 U.S. at 85. As a result, if an officer "deliberately or with a 'reckless disregard for the truth' ma[kes] material[ly] false statements in his affidavit [in support of a warrant] . . . or omit[s] from that affidavit 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading,'" an arrest based on the warrant is unreasonable. Miller, 475 F.3d at 627. Similarly, officers have no immunity based on a magistrate's warrant where "a reasonably well-trained officer in [the same] position would have known that his [application] failed to establish probable cause and that he should not have applied for the warrant." Malley, 475 U.S. at 345. Thus, the initial question for the court is whether Swick has presented sufficient facts that, if believed, so differ from the account Wilde presented to the magistrate that a jury could reasonably find that Wilde intentionally or recklessly mischaracterized or omitted material facts in his warrant application.[17] If so, Wilde could not rely on the protection of the magistrate's probable cause determination.

---

[17] Qualified immunity is ultimately a question of law for the court.

Here, Swick has presented facts so different from Wilde's version that a genuine dispute of material fact exists whether Wilde deliberately or recklessly misstated the facts to the magistrate when applying for Swick's arrest warrant. Indeed, if Swick's version of the events is believed, the facts fail to provide a basis for an officer to reasonably conclude that Swick and his friends engaged in the *felony* offense of intimidation or threatened intimidation (or its corollary, attempt) of Wilde, within the meaning of the statute. While the phrase "fanned out" may be subject to some interpretation, <u>see</u> <u>American Heritage Dictionary</u> (5th ed. 2011) (defining "fan" in part as "[t]o spread out like a fan"), the characterizations that the men "surrounded" Wilde to "prevent [him] from leaving," as Wilde

_____

However, if "a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." <u>Gregg v. Ham</u>, 678 F.3d 333, 339 (4th Cir. 2012) (internal quotation marks omitted). Motive and intent are questions of fact for a jury. <u>Monteiro v. City of Elizabeth</u>, 436 F.3d 397, 405 (3d Cir. 2006). Thus, whether Wilde's oral warrant application "contained misrepresentations and omissions made deliberately or with reckless disregard for whether they thereby made[] the [affidavit request for a warrant] misleading" is a question of fact for the jury. <u>See</u> <u>Miller</u>, 475 F.3d at 629 (explaining that a reasonable jury could <u>reach</u> such a conclusion if the plaintiff's version of the facts were determined to be true); <u>see also</u> <u>Dorn v. Town of Prosperity</u>, C/A No. 8:06-02571-RBH, 2008 WL 2076775, at *3 (D.S.C. May 9, 2008) (determining that under the plaintiff's version of the facts "a reasonable jury could find that the arrest warrant affidavit in the case at bar contained material misrepresentations made deliberately or with reckless disregard for the truth"), <u>subsequent proceeding rev'd on other grounds</u>, 375 F. App'x 284 (4th Cir. 2010) (unpublished).

represented to the magistrate, are more definite. (Doc. 26-6 at 108.) "Surround" means "[t]o extend on all sides of simultaneously; encircle" or "[t]o enclose or confine on all sides so as to bar escape or outside communication." Id. Swick's evidence is that three of his friends "were hovered around a tree" up to 75 feet away behind him (Doc. 26-2 at 132; Doc. 27-4 at 67) and not in a position to "surround" or encircle the officer. Runfola, meanwhile, was seated on a curb some fifty feet to Wilde's left. (Doc. 27-4 at 65.) Even Wilde acknowledges that although Runfola was situated most directly between Wilde's car and his apartment, neither Swick nor his friends said or did anything to prevent Wilde from leaving, made any threats, or blocked him from "escaping" to his apartment. (Doc. 26-5 at 86, 97-98.) All Wilde did to avoid walking by Runfola was to walk around a car next to Wilde's to head toward his apartment. (Id. at 98.)

Moreover, this encounter began at the pool where families were present with children playing (despite Wilde's testimony that he was "pretty close to panicked"). Wilde also did not disclose to the magistrate that he knew three of the five men as friends and/or acquaintances, including Swick himself, and that he knew they were also friends of his girlfriend, Mason. (Doc. 26-5 at 83; Doc. 26-6 at 120-21.) Wilde omitted these details as "not relevant" in his view (id. at 121), leaving the

34

impression that he was confronted by strangers -- an unknown person he charged and that person's gang.

Furthermore, the differences between Swick's and Wilde's opposing descriptions of the incident would be material to the probable cause determination. Cf. Miller, 475 F.3d at 628 (requiring that an officer's incorrect or false statements be "material"). A statement is "material" if it is "'necessary to the [neutral and disinterested magistrate's] finding of probable cause.'" Id. (alteration in original) (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)); see also Kungys v. United States, 485 U.S. 759, 770 (1988) ("The most common understanding . . . is that a concealment or misrepresentation is material if it 'has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking [sic] body to which it was addressed.") (defining "material" in the naturalization context). If a fact-finder were to accept Swick's version of the facts, it would show to a reasonable officer that Swick, an acquaintance, and his friends (two of whom were also Wilde's friends and/or acquaintances) followed Wilde from the pool area and kept their distance while Swick politely and calmly discussed the charges against him with Wilde -- not that Swick and his friends targeted him with an epithet at the pool, fanned out, surrounded the officer, and cut off his escape routes while demanding that charges be dropped. As such,

merely communicating with a potential trial witness about a
pending charge, in the absence of threatening language or
intimidating conduct, would be insufficient to sustain a
conviction. See Braxton, 183 N.C. App. at 44-45, 643 S.E.2d at
643.

Therefore, Swick has presented a genuine dispute of
material fact as to whether Wilde's characterization of the
incident, if rejected by a fact-finder in favor of Swick's,
could constitute the type of intentional or reckless disregard
for the accuracy of a warrant affidavit so as to vitiate the
magistrate's probable cause determination.[18] If the jury were to
credit Swick's version over Wilde's, "a reasonably well-trained
officer in [the same] position would have known that his
[application] failed to establish probable cause and that he
should not have applied for the warrant." Malley, 475 U.S. at
345.

---

[18] Defendants note that Vereen, too, consulted a magistrate and was
told that probable cause existed for Swick's arrest. (Doc. 29 at 17;
Doc. 26-7 at 46.) Indeed, Vereen consulted with a magistrate and
informed Wilde that "there was enough there to issue -- to get
warrants for Mr. Swick." (Doc. 26-7 at 46.) Yet Vereen states that
Wilde told him that he was singled out as "the pussy" at the pool,
Swick and his friends "fanned out around him" and had "surround[ed]
him" during the conversation. (Id. at 33, 34, 36.) Vereen also
reported that Wilde said that one of the men stood by the staircase to
Wilde's apartment to block or frustrate Wilde's access. (Id. at 61.)
Vereen thus says he got the clear impression that the men were seeking
to instigate a fight. (Id. at 38, 60-61.) The validity of Vereen's
report that the magistrate thought that a warrant might be justified
rises or falls on the quality of the facts Wilde presented to him.
Wilde admits, moreover, that the decision to charge Swick was
ultimately his to make, as the complaining party. (Doc. 26-6 at 105.)

As a second line of defense, however, Wilde points out that it is well-settled that even if the magistrate relies on inaccurate facts in making a probable cause determination, an arrest remains valid if the untainted facts would support a finding of probable cause. <u>Miller</u>, 475 F.3d at 630-31 ("[A]n officer who intentionally or recklessly puts lies before a magistrate, or hides facts from him, violates the Constitution <u>unless</u> the untainted facts themselves provide probable cause."). But as the court has already determined, the differences between Wilde's version of the events and Swick's are material. Viewing the evidence in the light most favorable to Swick, as the court is bound to do on a motion for summary judgment, the court cannot say as a matter of law that a reasonable officer in Wilde's position would have believed that he had probable cause to seek Swick's arrest based on the May 27 encounter.[19]

---

[19] Defendants also proffer "expert opinion witness reports" by Isaac T. Avery, III, and M. Kevin Smith, who opine that a reasonable officer in Wilde's position would have believed that he had probable cause to arrest Swick for felony witness intimidation. (Doc. 27-5; Doc. 27-6.) However, "'the issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony.'" <u>Cameron v. City of New York</u>, 598 F.3d 50, 62 (2d Cir. 2010) (quoting <u>Rizzo v. Edison Inc.</u>, 419 F. Supp. 2d 338, 348 (W.D.N.Y. 2005), <u>aff'd</u>, 172 F. App'x 391 (2d Cir. 2006) (unpublished)) (reversing trial court's decision to permit a police officer to testify that his fellow officers had probable cause to arrest the plaintiff). Defendants' experts' reports, which reach legal conclusions on probable cause, therefore, do not alter the court's analysis.

In a final effort to support a finding of probable cause, Wilde points out that he felt scared and intimidated by Swick and his friends during the conversation. (Doc. 26-5 at 85 (noting that Wilde felt "nervous" and "intimidated" and that his "heart started beating fast"); Doc. 26-6 at 133 ("pretty close to panicked").) However, North Carolina's obstruction of justice crimes, of which witness intimidation is one, "focus on the acts or attempted acts of the alleged obstructor [sic], rather than the reaction of the victim." Reed v. Buckeye Fire Equip., 241 F. App'x 917, 928 (4th Cir. 2007) (per curiam) (unpublished)[20] (citing N.C. Gen. Stat. § 14-226). Thus, Wilde's reaction is immaterial to the probable cause determination.[21]

---

[20] Unpublished opinions of the Fourth Circuit are not precedential and are cited as persuasive but not controlling authority.

[21] Wilde also notes that a grand jury indicted Swick on the charge of felony witness intimidation (and that the case was tried to a jury) and argues that this fact bolsters his probable cause argument. (Doc. 29 at 17.) However, the Fourth Circuit has held that "a grand jury's decision to indict . . . will [not] shield a police officer who deliberately supplied misleading information that influenced the decision." Goodwin v. Metts, 885 F.2d 157, 162 (4th Cir. 1989), overruled in part, Albright v. Oliver, 510 U.S. 266 (1994); see also Miller, 475 F.3d at 632 (explaining that the Constitution does not permit a police officer "with reckless disregard for the truth, to make material misrepresentations or omissions to seek [an arrest] warrant that would otherwise be without probable cause"). In this case, as noted above, Swick has identified a genuine dispute of fact whether Wilde mischaracterized the events on May 27, thus tainting the magistrate's decision to issue an arrest warrant and the grand jury's decision to indict.

38

### iii. **Summary**

Defendants are entitled to summary judgment as to Swick's claims related to his May 20 arrest for driving with a revoked license because Mason had probable cause to seek Swick's arrest. However, while mindful of the difficult positions with which law enforcement officers are confronted and the need both to protect their safety and accord them appropriate protection when they present their applications to a magistrate for review, the court concludes that Swick has shown a genuine dispute of material fact concerning whether the May 27 arrest warrant was supported by probable cause. Because determining what version of the events actually occurred will turn on the credibility of the parties' witnesses, the court cannot say as a matter of law that no constitutional violation occurred. The court is therefore bound to determine whether the alleged violation emanating from that arrest was of a clearly established right.[22]

### b. **Clearly Established Right**

"A right is 'clearly established' if its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." LeSueur-Richmond,

---

[22] Defendants do not argue that the undisputed facts would support a finding of probable cause for Swick's arrest on any other ground, such as obstruction of justice, see, e.g., Sennett v. United States, 667 F.3d 531, 535-36 (4th Cir. 2012) (noting that "it is irrelevant to the probable cause analysis what crime a suspect is eventually charged with"). Thus, the court does not reach that question.

666 F.3d at 269 (alteration in original) (citation and internal
quotation marks omitted). The "salient question is whether the
state of the law at the time of the asserted constitutional
violation gave [Defendants] fair warning that [their] alleged
conduct was unconstitutional." Miller, 475 F.3d at 631
(citation and internal quotation marks omitted). "Earlier cases
involving 'fundamentally similar' or 'materially similar' facts
are 'not necessary to such [a] finding.'" Id. (quoting Hope v.
Pelzer, 536 U.S. 730, 741 (2002)).

The Fourth Amendment protection from arrest in the absence
of probable cause is a "clearly established" right. Henderson
v. Simms, 223 F.3d 267, 273 (4th Cir. 2000). Generally, though,
characterizing the right in this way results in "too high a
level of generality." McKinney, 431 F.3d at 419 n.5. Instead,
the court should focus on "the right in light of the specific
context of the case," id. at 417, asking whether it would have
been clear "to a reasonable officer that the conduct in which he
allegedly engaged was unlawful in the situation he confronted,"
Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 301 (4th Cir.
2004) (internal quotation marks omitted).

In this case, viewed in the light most favorable to Swick,
the facts demonstrate that a reasonable officer in Wilde's
circumstances would have recognized that seeking Swick's arrest
for communicating threats or intimidating a witness based on

40

mischaracterized or omitted evidence, without which the warrant lacked probable cause, would have been unconstitutional. The Fourth Circuit has held that "[t]he law was unquestionably clearly established [at least by 2007] . . . that the Constitution did not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause." Miller, 475 F.3d at 632. Indeed, "a reasonable officer cannot believe a warrant is supported by probable cause if the magistrate is misled by statements that the officer knows or should know are false." Smith v. Reddy, 101 F.3d 351, 355 (4th Cir. 1996) (citing United States v. Leon, 468 U.S. 897, 922-23 (1984)).

In addition, a reasonable officer would have found it clear that he was not at liberty to seek an arrest for communicating threats or intimidation of a witness in the absence of probable cause. As the Supreme Court has made clear, "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." Ybarra v. Illinois, 444 U.S. 85, 91 (1979). A reasonable police officer in Wilde's position would not have believed that he could obtain an arrest in the absence of particularized evidence demonstrating that North Carolina's communicating threats or intimidating a witness statutes had

41

been violated.  See Merchant, 677 F.3d at 665-66 (finding it clearly established that the Fourth Amendment does not "permit[] an arrest when no aspect of the [charged crime] had been established").

It follows that the second step of the court's qualified immunity analysis -- whether the Fourth Amendment right was clearly established under the particular factual scenario of this case -- must be resolved against Wilde for purposes of Defendants' summary judgment motion.  Accordingly, Wilde is not entitled to qualified immunity as a matter of law as to the May 27 arrest.[23]

### 3.  Merits of Swick's Federal Claims

Now that the court has concluded that Defendants' probable cause argument does not entitle them as a matter of law to qualified immunity for the May 27 arrest, the court must examine the merits of Defendants' motion for summary judgment as to Swick's federal claims.

### a.  Unreasonable Seizure (First Cause of Action)

Swick's first cause of action is that Defendants unreasonably seized him following the May 27 confrontation in

---

[23] Denying Wilde's summary judgment on his qualified immunity argument today does not mean that the issue is finally resolved against him. See Merchant, 677 F.3d at 665 n.6.  Defendants are entitled to assert the defense at trial, "pursuant to which the jury could resolve the disputed facts in [their] favor, such that qualified immunity applies."  Id.

violation of the Fourth and Fourteenth Amendments.[24]  The Fourth
Circuit recognizes unreasonable seizure claims against officers
who pursue an arrest warrant against an individual where they
know probable cause is lacking.  Merchant, 677 F.3d at 665.  The
court, however, has stopped short of identifying a separate
constitutional right to be free from malicious prosecution.
Durham v. Horner, No. 11-1022, slip op. at 9 (4th Cir. Aug. 8,
2012).  Instead, the Fourth Circuit has analogized Fourth
Amendment unreasonable seizure claims to the common law tort of
malicious prosecution and noted that unreasonable seizure claims
"incorporate[] certain elements of the common law tort," in
particular "the requirement that the prior proceeding terminate
favorably to the plaintiff."  Lambert v. Williams, 223 F.3d 257,
262 (4th Cir. 2000).  To succeed on such claims, therefore, a
"plaintiff must demonstrate both an unreasonable seizure and a
favorable termination of the criminal proceeding flowing from

---

[24] Although Defendants' briefs characterize Swick's claim as one for
"wrongful arrest" (Doc. 29 at 18), the Fourth Circuit has held that
false arrest claims are unavailable when police officers have obtained
a facially valid arrest warrant prior to an individual's arrest.
Porterfield, 156 F.3d at 568; see also Davis v. Jenkins, Civ. A. No.
HAR 91-3127, 1993 WL 195142, at *3 (D. Md. 1993) (citing authority for
the proposition that "officers who do not take part in [an] actual
arrest cannot be held liable for arrest without probable cause,
because their conduct could not have been the proximate cause of the
injuries suffered as a result of the arrest"), aff'd, 46 F.3d 1123
(4th Cir. 1995) (per curiam) (unpublished table decision).  Rather, a
Fourth Amendment claim analogous to malicious prosecution is
appropriate.  Porterfield, 156 F.3d at 568.

43

the seizure." Snider v. Seung Lee, 584 F.3d 193, 199 (4th Cir. 2009); see also Durham, No. 11-1022, at 9.

The court finds that Swick has established a genuine dispute of material fact related to his section 1983 unreasonable seizure claim. First, subjecting an individual to arrest in the absence of probable cause would amount to an unreasonable seizure. See Merchant, 677 F.3d at 665 (concluding that where an officer knew that probable cause was lacking, the ensuing arrest was unreasonable notwithstanding an arrest warrant signed by a magistrate); Grider v. City of Auburn, 618 F.3d 1240, 1256 (11th Cir. 2010) ("[A]n arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment."). For the reasons discussed, Wilde potentially lacked probable cause to seek Swick's arrest on May 27, and Swick has pointed to facts indicating that Wilde may have mischaracterized or omitted material evidence against Swick to obtain a warrant. Thus, Swick has demonstrated a genuine dispute of material fact as to the first element. Second, because the communicating threats charge was dismissed prior to trial (Doc. 27-7 at 4) and a jury found Swick not guilty of intimidating a witness (Doc. 28-4 at 364), Swick has demonstrated a favorable termination of the criminal proceedings.

Moreover, and as discussed extensively above, Wilde's qualified immunity defense fails at this stage with respect to Swick's unreasonable seizure claim. Wilde's decision to seek Swick's arrest would be unreasonable in the absence of probable cause, and the Fourth Circuit has held that "[n]o reasonable police officer in [the defendant's] position could have believed that the Fourth Amendment permitted an arrest when no aspect of the [criminal statute in question] had been established." Merchant, 677 F.3d at 666.

As a result, Swick may proceed on his Fourth Amendment claim for unreasonable seizure against Wilde to the extent it results from the May 27 arrest, and Defendants' motion for summary judgment on the first cause of action will be denied to that extent.

However, there is no indication that Mason, Vereen, or Blue played any role in Swick's arrest other than that they may have encouraged him to speak with a magistrate about filing charges against Swick. Even construing the evidence in Swick's favor, the most that can be said is that these Defendants relied on inaccurate information from Wilde. Given that Wilde was an eyewitness to the events in question and the lack of evidence in the record that any of his fellow officers had a reason to doubt his veracity, this mistake was objectively reasonable, and Mason, Vereen, and Blue are entitled to qualified immunity for

their role in these events. See Green v. Nocciero, 676 F.3d 748, 751-52 (8th Cir. 2012) (affirming the district court's grant of qualified immunity to officers who reasonably relied on inaccurate information from a fellow defendant when arresting the plaintiff). Swick's claims against the Town of Chapel Hill, meanwhile, are addressed in Part II.A.3.f, *infra*, and, for the reasons stated in that section, are meritless. Therefore, Defendants' motion as to Mason, Vereen, Blue, and the Town of Chapel Hill (and any claims arising out of the May 20 arrest) will be granted.

### b. Criminalizing Speech and Retaliation (Second and Third Causes of Action)

Swick also alleges that each of the Defendants violated his First Amendment right to criticize the conduct of officers Mason and Wilde by subjecting him to an arrest and a subsequent criminal prosecution in the absence of probable cause.[25]  (Doc. 1 ¶¶ 109-11, 120-22.)  Defendants contend that Swick's claims fail as a matter of law because Wilde had probable cause to arrest Swick on May 27, Swick's "criminal and threatening conduct . . .

---

[25]  Swick's complaint raises two claims under the First Amendment: "criminalizing speech" (second cause of action) and "retaliation" (third cause of action).  Because both claims rely on the allegation that Swick engaged in the protected activity of protesting and criticizing Wilde's and Mason's conduct and that he was unlawfully seized as a result of his statements (Doc. 1 ¶¶ 109-11, 120-22), both are in the nature of retaliation claims, and the court will treat them as such.

is not protected by the First Amendment," and there is no evidence that Wilde had a retaliatory motive for arresting Swick. (Doc. 29 at 18-19.)

To establish a section 1983 retaliation claim under the First Amendment, Swick must prove that (1) he was engaged in constitutionally protected speech, (2) the defendant's allegedly retaliatory action "adversely affected the plaintiff's constitutionally protected speech," and (3) "a causal relationship [exists] between [Swick's] speech and the defendant's retaliatory action." Blankenship v. Manchin, 471 F.3d 523, 528 (4th Cir. 2006) (internal quotation marks omitted). A plaintiff must also plead and prove a lack of probable cause for the underlying charge. Hartman v. Moore, 547 U.S. 250, 265-66 (2006).[26]

For purposes of this motion, the court has already determined that Swick has created a genuine dispute of material fact about whether Wilde had probable cause for the May 27 arrest. In addition, Defendants' arrest and subsequent

---

[26] Hartman dealt only with the elements of retaliatory prosecution claims. 547 U.S. at 265-66. However, at least some circuit courts that have addressed the issue have required a plaintiff to demonstrate that an arresting officer lacked probable cause in order to succeed on a claim of retaliatory arrest as well. See John Koerner, Note, Between Healthy and Hartman: Probable Cause in Retaliatory Arrest Cases, 109 Colum. L. Rev. 755, 756-57 (2009). Because Swick has demonstrated a genuine dispute of material fact about whether Wilde had probable cause for Swick's May 27 arrest and subsequent prosecution, the court need not resolve the issue here.

prosecution of Swick is sufficient evidence to create a genuine dispute of fact concerning whether Wilde's actions adversely affected Swick's free speech rights. See, e.g., Hansen v. Williamson, 440 F. Supp. 2d 663, 677 (E.D. Mich. 2006) ("An arrest would likely dissuade 'a person of ordinary firmness' from continuing to engage in protected conduct."). Thus, just two questions are at issue here: (1) Was Swick engaged in constitutionally protected speech during his May 27 conversation with Wilde, and (2), if so, did a causal connection exist between Swick's speech and Defendants' decision to seek his arrest and prosecution?

Defendants contend that Swick's speech is not protected by the First Amendment because he was engaged in criminally threatening conduct, citing United States v. Marchetti, 466 F.2d 1309 (4th Cir. 1972), and similar cases. To be sure, the First Amendment does not protect statements that are "true threat[s]," Virginia v. Black, 538 U.S. 343, 359 (2003) (noting that threats of violence are outside the First Amendment's protections), and an individual engaged in criminal conduct cannot insulate his criminal activity by claiming protection under the First Amendment. However, the court has already determined that a genuine issue of fact exists for trial concerning whether Swick engaged in threatening conduct -- one that, if settled in Swick's favor, would undermine Defendants' argument. Thus,

48

Defendants have not shown as a matter of law that Swick's conversation with Wilde falls outside of the First Amendment's protection.

Moreover, Defendants fail to recognize that Swick has identified evidence tending to show that he was engaged in constitutionally protected speech during his May 27 conversation with Wilde. It is well settled that "public criticism of . . . governmental operations[] and . . . officials is at the very core of the constitutionally protected free speech area." Bradley v. Computer Scis. Corp., 643 F.2d 1029, 1033 (4th Cir. 1981); see also City of Houston v. Hill, 482 U.S. 451, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Here, Swick asked why Wilde and Mason were "throw[ing] [him] under the bus"[27] (Doc. 26-2 at 121-22) and why the police were "target[ing]" him (Doc. 28-3 at 211; Doc. 26-2 at 156; Doc 27-7 at 3). Both questions tend to impugn

---

[27] Neither party has defined the idiomatic phrase "throw (someone) under the bus," and the precise meaning of the expression is unclear. In general "to throw (someone) under the bus" means "to reject or betray (someone); to treat as a scapegoat" or to "sacrifice some other person, usually one who is undeserving or at least vulnerable, to make personal gain." L.A. Johnson, A Cliché Rolls On: Is it Time to Throw 'Under the Bus' Under the Bus?, Pittsburgh Post-Gazette, July 2, 2008, at C-1. Regardless of its precise definition, it is safe to say a reasonable jury could conclude that the comment was intended to impugn Wilde's and Mason's performance as police officers.

Wilde's and Mason's impartiality and performance as law enforcement officers and are the type of critiques of government actors that the First Amendment protects.

As to the issue of whether a causal relationship existed between Swick's speech and Defendants' decision to arrest and prosecute him, the Supreme Court has explained that a section 1983 plaintiff "must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action." Hartman, 547 U.S. at 259. In other words, the plaintiff must identify some evidence showing that the defendant harbored an "improper motive" towards the plaintiff for purposes of the causation element. See Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir. 2001). Courts have taken differing approaches regarding what a plaintiff must show to demonstrate causation at the prima facie stage of litigation. Some courts require the plaintiff to demonstrate "but-for causation" -- some "specific evidence 'that but for the retaliatory motive, the complained of incident would . . . not have occurred.'" Johnson-El v. Beck, No. 3:11-cv-115-RJC, 2011 WL 1155679, at *4 (W.D.N.C. Mar. 25, 2011) (alteration in original) (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995)). Other courts apply a burden-shifting approach, under which the plaintiff must produce evidence that his "protected activity was a motivating factor in the defendant's retaliatory

action," see Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004)
(collecting cases), which the defendant may rebut by showing "by
a preponderance of the evidence" that he would have taken the
same action in the absence of the protected activity. Greene v.
Doruff, 660 F.3d 975, 979 (7th Cir. 2011). This burden-shifting
approach -- at least where the plaintiff satisfies his burden
and the defendant fails his -- ultimately results in an
inference of but-for causation (i.e., that the plaintiff would
not have been harmed had the defendant not violated his rights).
Id.

Here, the court need not decide which approach to apply
because Defendants have failed to show that they are entitled to
judgment as a matter of law under either approach. Swick argues
that Wilde arrested him because he criticized Wilde and the
Chapel Hill police force and accused Wilde and Mason of unfairly
targeting him. Swick's position is bolstered by the fact that
the magistrate's arrest warrant specifically notes that a basis
for the intimidating a witness arrest was Swick's "STATEMENTS AS
TO WHY THE POLICE WERE OUT TO GET HIM, WHY HE WAS BEING THROWN
UNDER THE TRAIN,[28] [AND] WHY ARE YOU TARGETING ME." (Doc. 27-7
at 3 (emphasis in original).)

---

[28] Swick states that he used the word "bus" rather than "train." (Doc.
26-2 at 130.) The specific word is immaterial to the court's
analysis.

Under the burden-shifting approach, this evidence is a sufficient showing of constitutionally protected activity to shift the burden to Defendants to demonstrate that Wilde would have taken the same action in the absence of Swick's speech. Defendants attempt to make that showing by contending, first, that Wilde had probable cause for the May 27 arrest, and second, that "no evidence of retaliation exists" and that there "is no evidence of any animosity among or prior negative encounters between plaintiff and defendants." (Doc. 29 at 19-20.) Yet this proffer is insufficient to demonstrate, as a matter of law, that the arrest would have occurred in the absence of Swick's speech. The court has already identified a genuine dispute of fact for trial over whether Wilde had probable cause for Swick's arrest. In addition, Defendants' argument that no evidence of retaliation exists overlooks the undisputed evidence that Swick made critical comments about Wilde, Mason, and the Chapel Hill police force during the May 27 conversation and that his statements appear to have played an important role in Wilde's decision to seek Swick's arrest. Wilde, after all, told the magistrate that Swick asked why Wilde and Mason had sought his arrest on May 20 and "why he was being thrown under the bus." (See Doc. 26-6 at 108.) Accordingly, Swick has created a genuine dispute for trial under the burden-shifting approach.

Applying the "but-for causation" approach does not change the result. The "but-for" causation approach does not require proof that retaliation is the "sole motive" for an arrest. Kilpatrick v. King, 499 F.3d 759, 767 (8th Cir. 2007). Instead, it requires a showing that the harm would not have occurred in the absence of the retaliatory motive. See Hartman, 547 U.S. at 260 (explaining that "but-for causation" requires a showing that in the absence of retaliatory animus, "the adverse action would not have been taken"). In this context, "but-for" causation may be demonstrated by showing "that the plaintiff[] w[as] 'singled out' because of [his] exercise of constitutional rights." Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010) (per curiam); see also Guillory v. City of Anaheim, 979 F.2d 854 (9th Cir. 1992) (unpublished table decision) (explaining that proof that a plaintiff was "singled out for harassment on the basis of his expressive activity" demonstrates that government officials harbored a "retaliatory" motivation).

Here, Swick has shown facts that indicate Wilde's decision to seek his arrest was motivated by retaliation for Swick's criticism of Wilde, Mason, and the Chapel Hill police force. According to Wilde, the reason he sought Swick's arrest was because he felt threatened and intimidated by his confrontation with Swick and his friends on May 27. His concerns, he states, arose because Swick's friends "surrounded [Wilde], cut off an

escape route to [his] house, [and] Mr. Swick approached [Wilde] [and] start[ed] blaming [him] for [Swick] being charged with criminal offenses . . . ." (Doc. 26-5 at 89.) This suggests that aside from Swick's statements, he and his four friends were similarly situated. Recall that, as Wilde recounts it, Swick and his friends followed the officer from the pool and "surrounded" him. All of them "approached" Wilde up to a point and then "fanned out." (Id. at 88.) And when Wilde was asked whose actions intimidated him, he responded, "It's all of them," referring to Swick and his friends. (Id. at 89.) Yet only Swick spoke critically of Wilde, Mason, and the Chapel Hill police, and significantly, Wilde sought only Swick's arrest.[29] (Doc. 26-6 at 114-15.) This is sufficient evidence, if believed, for a reasonable jury to conclude that Swick's exercise of his First Amendment rights was a "but-for" cause of Wilde's decision to seek Swick's arrest.

Defendants' qualified immunity defense is of no avail to Swick's First Amendment retaliation claim at the summary judgment stage of litigation. Swick has identified a genuine dispute of fact concerning whether he suffered an

---

[29] Although Wilde did not know "about half" of the men that followed him from the pool, he affirmatively represents that he recognized Swick and Alvarado (Doc. 26-5 at 84) and that it would have been "fairly easy" to obtain Alvarado's identifying information (Doc. 26-6 at 115). Thus, Alvarado was similarly situated to Swick in that Wilde would have known Alvarado's identifying information had he elected to file charges against him.

54

unconstitutional injury -- his arrest -- as a result of Wilde's alleged retaliatory motive, and the Fourth Circuit has held that "it was clearly established [in 2001] that the First Amendment prohibits an officer from retaliating against an individual for speaking critically of the government," as Swick did here. Trulock, 275 F.3d at 406.

However, Swick's First Amendment claims against Mason, Vereen, and Blue in their individual capacities and the Town of Chapel Hill fail for the same reasons that his unreasonable seizure claim against them fails. Namely, Swick has not made a factual showing that the individual Defendants had any material involvement in the decision to arrest Swick. Moreover, and as is discussed in greater detail with respect to Swick's eighth cause of action, see infra Part II.A.3.f, Swick's First Amendment claims against the Town of Chapel Hill fail because he has not shown that Wilde's actions were authorized by an "express policy" or a person with final decision-making authority, the result of an omission such as inadequate training, or caused by a widespread and persistent practice such "as to constitute a custom or usage within the force of the law," necessary to hold a municipality liable for the torts of its employees. See Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

Consequently, Defendants' motion for summary judgment of Swick's First Amendment retaliation claims (Second and Third Causes of Action) will be granted as to Mason, Vereen, Blue, and the Town of Chapel Hill, and denied in all other respects.

### c. Fabrication of Evidence (Fourth Cause of Action)

In this cause of action, Swick alleges that each of the Defendants violated his rights under the Fourth and Fourteenth Amendments by fabricating evidence used to support his arrests. For a plaintiff to prevail on a claim of evidence fabrication in the Fourth Circuit, he must demonstrate proof that Defendants fabricated evidence and that the fabrication resulted in a deprivation of his liberty. Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005).

The parties have devoted little analysis to this claim in their briefing. Swick does not identify any evidence that was allegedly fabricated; rather he simply makes general assertions that probable cause did not exist to support the May 27 arrest[30] (Doc. 32 at 6-12) and seems to rely on his position that Wilde misled the magistrate when he stated that Swick's friends

---

[30] That Swick's complaint does little more than state that the facts alleged constitute a violation of the Fourth and Fourteenth Amendment does not, on its face, preclude the court from assessing the factual merits of his claim. See Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996) (considering the plaintiff's factual assertions on the defendant's motion for summary judgment despite the fact that the complaint "simply claims that the facts alleged implicate rights protected by the Fourth . . . and Fourteenth Amendments").

"fanned out" and "surrounded" him. Defendants say they are unsure what evidence was supposedly fabricated and confine their argument to rebutting allegations that Mason or the Chapel Hill police fabricated evidence that Swick's license was revoked when the warrant was issued for his arrest on May 20.[31] (Doc. 29 at 20-21.)

The court has already determined that a genuine dispute of material fact exists whether Wilde mischaracterized the May 27 incident in seeking a warrant for Swick's arrest by misstating facts. Neither party has addressed whether this is sufficient for a showing of evidence fabrication in light of Washington, 407 F.3d at 282 (finding that a police officer's report containing an "unclear" statement (stating falsely that the defendant gave pertinent information about the crime that no one else knew) constituted "fabrication" of evidence sufficient to amount to a constitutional violation). Specifically, neither party has addressed whether Swick's allegation that Wilde orally misrepresented the facts to the magistrate qualifies as evidence fabrication. But because a customary reading of "fabricate" includes the telling of a lie, see American Heritage Dictionary (5th ed. 2011) (defining "fabricate" in part as "[t]o concoct in order to deceive"); Webster's Third New International Dictionary

---

[31] The court has already ruled that any claims emanating from the May 20 arrest are barred because probable cause existed for it.

57

(1986) (defining "fabrication" in part as "the invention or utterance of something calculated to deceive"), and in the absence of any further showing by Wilde as to why an alleged verbal lie cannot constitute fabrication, the court finds that Wilde has failed to demonstrate that he is entitled to judgment as a matter of law.

Here, Swick was arrested, charged with a felony, and subjected to a criminal trial. These suffice as a deprivation of liberty for purposes of Swick's claim. McFadyen v. Duke Univ., 786 F. Supp. 2d 887, 944 (M.D.N.C. 2011) ("[S]ome courts have recognized a Fourteenth Amendment [deprivation of liberty claim] in the context of pre-trial proceedings, where the fabricated evidence resulted in the citizen's arrest after his indictment."); see also Pritchard v. Perry, 508 F.2d 423, 425 (4th Cir. 1975) ("That an infringement of personal liberty such as follows from an unconstitutional arrest has resulted in but a short period of restraint or has involved no physical injury may go in mitigation of damages but it manifestly cannot immunize the constitutional deprivation or abort an aggrieved plaintiff's right of action under Section 1983."). In addition, it was reasonably foreseeable that Wilde's alleged mischaracterization of the evidence would result in Swick's arrest and subsequent criminal prosecution, establishing proof for the causation element. See Washington, 407 F.3d at 283; Jones v. City of

58

<u>Chicago</u>, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial -- none of these decisions will shield a police officer who deliberately supplied misleading information that induced the decision.").

Moreover, Wilde has not demonstrated an entitlement, as a matter of law, to a defense of qualified immunity to the fabrication of evidence claim.  As noted above, Swick has raised a genuine dispute of material fact concerning whether a constitutional violation occurred, and the Fourth Circuit has held that the "right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer . . . was clearly established [as far back as] 1983." <u>Washington</u>, 407 F.3d at 283-84 (citing <u>Miller v. Pate</u>, 386 U.S. 1, 7 (1967)).

Consequently, at least on this record, the court will deny Defendants' motion for summary judgment as to Swick's fabrication of evidence claim (fifth cause of action) against Wilde.  Yet because Swick has pointed to no evidence in the record that Mason, Vereen, Blue, or the Town of Chapel Hill played any role in any alleged fabrication of evidence, Defendants' motion for summary judgment as to these Defendants will be granted in all respects.

59

### d. Concealment of Evidence (Fifth Cause of Action)

Next, Swick alleges that Wilde, Mason, Vereen, and Blue concealed evidence in violation of the Sixth and Fourteenth Amendments. Here, too, Swick's complaint and brief fail to identify the evidence that was supposedly concealed or any authority to support his claim.

A successful claim of evidence concealment requires a showing that the defendant withheld favorable evidence material to a criminal defendant's guilt or punishment after the defendant requested the evidence. See Brady v. Maryland, 373 U.S. 83, 87 (1963). Brady's protections, however, arise under the Fourteenth Amendment and are designed to ensure fair criminal trials -- not to create rights for arrestees in the warrant application process. See United States v. Colkley, 899 F.2d 297, 302-03 (4th Cir. 1990); see also Johnston v. Town of Greece, 983 F. Supp. 348, 358 n.5 (W.D.N.Y. 1997) (refusing to apply Brady to "the warrant application process" where no determination of guilt or innocence is made). The Sixth Amendment, meanwhile, does not protect against evidence concealment. See Whitley v. Allegheny Cnty., Civ. A. No. 07-403, 2010 WL 892207, at *23 (W.D. Pa. Mar. 9, 2010), aff'd, 402 F. App'x 713 (3d Cir. 2010) (unpublished).

In light of this legal standard, Swick's evidence-concealment claim fails. Not only does he fail to identify the

evidence that he claims was concealed, he fails to demonstrate any proof that he requested the evidence or that it affected his trial in any way. In addition, to the extent Swick's claims arise from the testimony of Mason or Wilde during the criminal proceedings, police officers cannot be held liable under section 1983 for their testimony at trial. Briscoe v. LaHue, 460 U.S. 325, 345-46 (1983). Finally, the Fourth Circuit has recognized that plaintiffs have no Fourteenth Amendment right in avoiding prosecution based on less than probable cause, even when police officers fail to disclose exculpatory evidence to the prosecutor. See Taylor v. Waters, 81 F.3d 429, 436 & n.5 (4th Cir. 1996) (citing Albright v. Oliver, 510 U.S. 266, 268 (1994)). Thus, Swick's claim for concealment of evidence fails as a matter of law, and Defendants' motion for summary judgment will be granted.

### e. Failure to Intervene (Sixth Cause of Action)

Swick also brings claims against each individual Defendant in his or her individual capacity and the Town of Chapel Hill for "turn[ing] a blind eye" to the "constitutional violations" they knew "were about to be committed or were occurring in their presence." (Doc. 1 ¶ 155.) Defendants contend that this claim is "invalid as a matter of law." (Doc. 29 at 21.) Defendants are correct.

61

Yet again, Swick makes no effort to explain the factual basis for his claim or to cite any authority showing why a ruling in his favor would be proper. Still, federal courts do recognize a claim under section 1983 against police officers who "fail[] or refuse[] to intervene when a constitutional violation such as an unprovoked beating takes place in [their] presence." Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998); see also Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994). To succeed on a theory of so-called "bystander liability," the plaintiff must show: (1) that the defendant knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. Randall v. Prince George's Cnty., 302 F.3d 188, 204 (4th Cir. 2002).

Defendants concentrate the bulk of their briefing on their contention that Wilde had probable cause to seek Swick's arrest without addressing Randall or its progeny. Notwithstanding, Swick's failure to intervene claim fails as a matter of law. The principal issue is whether Mason, Blue, or Vereen knew that Wilde was denying Swick his constitutional rights. See id. at 205 ("[T]he viability of the bystander liability verdict turns on what [the officers] knew about each of the Appellees."). But there is no evidence that Mason was involved in the May 27 arrest at all. And although Blue and Vereen knew that Wilde

intended to seek Swick's arrest, both supervisors were told the same information that Wilde had communicated to the magistrate (i.e., that Swick's friends had fanned out, surrounded him, and prevented him from leaving). Certainly, Blue and Vereen could not have "disregard[ed] readily available exculpatory evidence," but they cannot be blamed for "fail[ing] to pursue a potentially exculpatory lead" based on Wilde's alleged mischaracterization of the evidence. See Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002) (internal quotation marks omitted).

As a result, summary judgment on Swick's failure to intervene cause of action will be entered in favor of Defendants.

### f. Supervisory Liability and Municipal Liability (Seventh and Eighth Cause of Action)

Swick's next claims are for supervisory liability against Blue and Vereen in their individual capacities and municipal liability against the Town of Chapel Hill based, first, on the conduct of Blue and Vereen in their official capacities and, second, against the Town directly. (Doc. 1 at 54.) Defendants challenge these claims, arguing that they are invalid as a matter of law and point out that Swick's official capacity claims fail because they do not identify "a constitutionally invalid policy, custom, or practice" that precipitated the

63

"alleged wrongful conduct." (Doc. 28 at 22-23.) Defendants are correct.

Section 1983 recognizes that a supervisory official may be held liable "in certain circumstances for the constitutional injuries inflicted by [his] subordinates." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). In Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit explained that a plaintiff must establish three elements to succeed on a claim of supervisory liability under section 1983: (1) the supervisor "had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) the supervisor's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) an "affirmative causal link" exists "between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Id. at 799 (citations omitted). Under Shaw's first prong, "the conduct engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread, or at least has been used on several different occasions.'" Randall, 302 F.3d at 206 (quoting Shaw, 13 F.3d at 799).

64

Here, the record is devoid of any evidence that subordinates of Blue or Vereen were engaging in pervasive or widespread conduct that created a risk of constitutional injuries to individuals like Swick. The parties discuss only three arrests at any length (Swick's arrests on January 20, May 20, and May 27), but two of those arrests (the January 20 and May 20 arrests), as explained above, were supported by probable cause. Thus, the only potential constitutional injury would have resulted from Wilde's decision to seek Swick's arrest on May 27. Although there is a genuine question for trial about whether Wilde mischaracterized certain evidence when seeking a warrant for Swick's arrest, there is no indication that his conduct was pervasive or widespread or that Blue and Vereen even knew about the potential mischaracterization in this case, much less in other unidentified incidents. See id. (explaining that a plaintiff alleging supervisory liability ordinarily "cannot satisfy his burden of proof by pointing to a single incident or isolated incident" (internal quotation marks omitted)). As a result, Blue and Vereen are not liable in their individual capacities for the individual and, on this record, isolated actions of Wilde.

To the extent Swick brings a supervisory liability claim against the Town of Chapel Hill for the official actions of Blue and Vereen, it, too, fails. Official-capacity suits under Ex

65

parte Young, 209 U.S. 123 (1908), permit plaintiffs to seek injunctive relief against state officials where the state itself is immune from liability under the Eleventh Amendment. See Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 645-46 (2002). Plaintiffs, however, may bring section 1983 claims against municipalities directly. Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief."). Consequently, any official-capacity claim against Blue and Vereen would be subsumed by Swick's section 1983 claim against the Town of Chapel Hill.

However, Swick's direct claims against the Town are likewise unavailing. "[A] municipality cannot be held liable simply for employing a tortfeasor." Riddick v. Sch. Bd. of Portsmouth, 238 F.3d 518, 522 (4th Cir. 2000). Instead, municipal liability exists only "'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir. 1987) (quoting Monell v. Dep't of Social Servs. of New York, 436 U.S. 658, 694 (1978)). To establish municipal liability, plaintiffs must show (1) a

municipal policy or person with final decision making authority directly authorizing unconstitutional police action, (2) "deficient programs of police training and supervision which are claimed to have resulted in constitutional violations by untrained or mis-trained police officers," or (3) "irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example." Id. at 1388-89; see Lytle, 326 F.3d at 471. Ultimately, "[t]he challenged policy or custom cannot merely be the abstract one of violating citizens' constitutional rights." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). Rather, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. (internal quotation marks omitted).

Here, Plaintiff has pointed to no policy or custom that would make "'the specific [alleged] violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'"[32]   Id. (quoting Spell, 824 F.2d at 1390).

---

[32] Swick cites only two facts that could be construed as supporting his municipal liability cause of action. First, he points out that Mason and Wilde, when questioned about the First Amendment and its limitations on police power, had difficulty recalling the Amendment's prohibitions. (See Doc 26-3 at 35-37; Doc. 26-6 at 147-48.)  The court has already determined that Swick has no viable First Amendment claim against Mason, and Wilde has submitted unopposed evidence that he received constitutional law training at the police academy in Greensboro. (Doc. 26-5 at 41-42.)  Second, Swick notes that the

67

Instead, the only evidence of potential wrongdoing -- even with the facts read in a light most favorable to Swick -- is that Wilde possibly mischaracterized the events on May 27 to the North Carolina magistrate. This isolated incident, which the facts do not show to be the product of improper training, supervision, or policy, is not the type of evidence necessary to impose municipal liability. Therefore, Defendants are entitled to summary judgment on Swick's Seventh and Eighth causes of action.

### g. Conspiracy (Ninth Cause of Action)

Swick's final federal cause of action alleges that Defendants engaged in a conspiracy to violate his constitutional rights in violation of section 1983. (Doc. 1 at 61.) Defendants contend that "[n]o evidence of wrongful conduct exists" and that Swick has failed to show evidence of a plan or agreement among the police to violate his constitutional rights. (Doc. 29 at 23-24.)

---

Chapel Hill Police Department did not train its officers on the probable cause standard. (Doc. 32 at 24.) However, the facts do not support Swick's claim. The very portions of the record that Swick cites in support of his point reveal that Chapel Hill's police officers received training on the probable cause standard at the police academy and in field training exercises. (Doc. 26-3 at 18-19; Doc. 26-5 at 39 ("As far as probable cause, I don't think there's any specific, like, probable cause training, except for the [training related to the] elements of the crime."); Doc. 26-7 at 76 (explaining that Chapel Hill police officers have the discretion to determine whether probable cause exists for an arrest because the officers are "put . . . through the basic academy" and "give[n] . . . annual training").)

Neither party has briefed the issue of what elements must be shown to establish a civil conspiracy between police officers and Town officials under section 1983. Nevertheless, the Fourth Circuit has held that to "establish a civil conspiracy claim under [42 U.S.C.] § 1983, [a plaintiff] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." Glassman v. Arlington Cnty., 628 F.3d 140, 150 (4th Cir. 2010) (alterations in original) (quoting Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996)). To satisfy his burden of proof, a plaintiff "must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Hinkle, 81 F.3d at 421. The Fourth Circuit characterizes this burden as "weighty." Id.

Here, even assuming that Wilde mischaracterized the evidence he presented in his warrant application to the North Carolina magistrate, Swick has pointed to no direct or circumstantial evidence tending to show that any of the other Defendants was aware of the true facts, acted jointly with him, or shared the same objective to mislead the magistrate. Accordingly, summary judgment will be granted in favor of Defendants as to this cause of action.

**B.   State Law Claims**

Swick also brings a variety of state law claims against the Defendants based on his May 20 and 27 arrests.  As is explained below, each of these state claims, with the exception of the malicious prosecution cause of action, is meritless.

**1.   Malicious Prosecution (Tenth Cause of Action)**

Swick's first state law claim is for malicious prosecution and conspiracy against each Defendant in his or her individual capacity and the Town of Chapel Hill.  For the reasons stated above, Swick has failed to establish any evidence of a conspiracy between Defendants, and Defendants are entitled to summary judgment on Swick's state-law conspiracy claims.  As for Swick's malicious prosecution claim, he bears the burden of establishing the following elements under North Carolina law: "(1) defendant initiated the earlier proceeding; (2) malice on the part of defendant in doing so; (3) lack of probable cause for the initiation of the earlier proceeding; and (4) termination of the earlier proceeding in favor of the plaintiff." Best v. Duke Univ., 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994); Kirschbaum v. McLaurin Parking Co., 188 N.C. App. 782, 789, 656 S.E.2d 683, 687–88 (2008).  Defendants contest only two elements: probable cause and malice.

As explained above, Mason had probable cause for seeking Swick's arrest for driving with a revoked license on May 20.

Therefore, any malicious prosecution against Defendants based on that arrest is without merit. However, Swick has pointed to a genuine dispute of fact over whether Wilde had probable cause for seeking his arrest on May 27. As a result, only if Defendants can show that Wilde acted without malice are they entitled to summary judgment on this claim.

Defendants' only argument with respect to maliciousness is their naked assertion that Swick cites to "no evidence of malicious or corrupt conduct" on Wilde's behalf. (Doc. 29 at 25.) Malice, however, may be either express or implied. See Moore v. City of Creedmoor, 345 N.C. 356, 371, 481 S.E.2d 14, 24 (1997). "[I]mplied malice may be inferred from want of probable cause in reckless disregard of plaintiff's rights." Pitts v. Village Inn Pizza, Inc., 296 N.C. 81, 86-87, 249 S.E.2d 375, 379 (1978); see also Williams v. Kuppenheimer Mfg. Co., 105 N.C. App. 198, 203, 412 S.E.2d 897, 901 (1992) ("It is well settled that legal malice may be inferred from a lack of probable cause."). Here, Swick has identified a genuine dispute over whether Wilde intentionally or recklessly disregarded his rights in misrepresenting or omitting material information to the magistrate when applying for Swick's arrest without probable cause, creating the implication of malice. Accordingly, Defendants have not demonstrated that Wilde is entitled to summary judgment as to this claim.

Swick also brings malicious prosecution claims against Mason, Vereen, Blue, and the Town of Chapel Hill. Mason, Vereen, and Blue assert the defense of public official immunity, arguing that the doctrine bars any claims against them in the individual capacities. (Doc. 29 at 25.) Public official immunity in North Carolina prevents a public official from being held personally liable for "mere negligence" in actions he takes pursuant to his "governmental duties involving the exercise of judgment and discretion." Isenhour v. Hutto, 350 N.C. 601, 609-10, 517 S.E.2d 121, 127 (1999). Police officers are considered public officials. Id. at 610, 517 S.E.2d at 127 (citing State v. Hord, 264 N.C. 149, 155, 141 S.E.2d 241, 245 (1965)). This doctrine, therefore, affords protection to Mason, Vereen, and Blue because Swick has not demonstrated that the actions they took create culpability on their part -- much less that they were reckless or malicious.[33]

As for the Town of Chapel Hill, Swick contends that it is liable for the actions of Wilde under the doctrine of respondeat superior. (Doc. 32 at 19.) Defendants have not responded to

---

[33] Wilde, too, raises public official immunity as a defense. But because Swick has created a genuine dispute of fact concerning whether Wilde may have acted with implied maliciousness in pursuing the May 27 arrest, public official immunity, which protects only negligent, not intentionally tortious, actions does not bar Swick's claims against him. See Wells v. N.C. Dep't of Corr., 152 N.C. App. 307, 320, 567 S.E.2d 803, 813 (2002) (explaining that where a plaintiff alleges that a public official or employee committed an intentional tort, "neither a public official nor a public employee is immunized from suit in his individual capacity").

this argument, but it is well-settled law that the doctrine of "governmental immunity" blocks municipalities from being sued "for the negligence of its employees [who] act in the exercise of governmental functions," at least "absent waiver of immunity." Evans v. Hous. Auth. of Raleigh, 359 N.C. 50, 53, 602 S.E.2d 668, 670 (2004). Governmental immunity applies to both negligent and intentional torts. Massasoit v. Carter, 439 F. Supp. 2d 463, 485 (M.D.N.C. 2006) (Dickens v. Thorne, 110 N.C. App. 39[, 43], 429 S.E.2d 176[, 179] (1993)). Governmental immunity may be waived through the purchase of liability insurance, N.C. Gen. Stat. § 160A-485(a), but "only to the extent of the insurance obtained," Evans, 359 N.C. at 57, 602 S.E.2d at 673. Under North Carolina law, a municipality's participation in a local government insurance risk pool is sufficient to waive immunity. Dobrowolska ex rel. Dobrowolska v. Wall, 128 N.C. App. 1, 6, 530 S.E.2d 590, 595 (2000).

Unfortunately, neither party has briefed the issue of whether governmental immunity applies (or has been waived) in this case. Swick's complaint alleges that the Town of Chapel Hill has waived its immunity from civil liability by participating in a risk insurance pool and by purchasing liability insurance. (Doc. 1 at 4-5 ¶ 8.) Defendants' only apparent reference to governmental immunity is in their answer, where they acknowledge that

the Town participates in a risk pool that provides
coverage for certain claims, acts, and omissions and
that the Town has waived sovereign and governmental
immunity for certain acts and omissions, but only to the
extent of actual coverage under any such risk pool
policy or policies pursuant to North Carolina law.

(Doc. 7 at 5 ¶ 8.) However, no evidence concerning the extent

of the Town's coverage is cited in Defendants' motion or brief

for summary judgment. Defendants also fail to argue whether

Wilde's conduct can properly be said to fall within the exercise

of the Town's "governmental functions." Cf. See Dunn v. Mosley,

No. 4:10-CV-28-FL, 2011 WL 2457793, at *7 (E.D.N.C. June 16,

2011) (concluding that an officer exercising his police power

was performing a governmental function and citing cases).

Furthermore, Defendants have failed to demonstrate, as a

matter of law, that a municipality could not be held liable for

Wilde's actions under the facts of this case. As a general

matter, where governmental immunity is waived, cities can be

held liable for the torts of their police officers. See

Schlossberg v. Goins, 141 N.C. App. 436, 437, 540 S.E.2d 49, 51

(2000) (affirming trial court's denial of defendant city and

police officer's motion for summary judgment on plaintiff's

claims of assault, battery, false imprisonment/false arrest, and

malicious prosecution to the extent the city had waived its

governmental immunity through the purchase of an insurance

policy covering those claims). And although it is "rare,"

74

intentional torts can sometimes fall within the scope of an employee's employment such that his employer can be liable for the employee's conduct under respondeat superior. See Borneman v. United States, 213 F.3d 819, 828 (4th Cir. 2000) (observing that while "an intentional tort is rarely considered to be within the scope of an employee's employment, . . . 'rarely' does not mean 'never'").

Therefore, given the Town of Chapel Hill's admitted participation in a risk pool that would waive at least portions of its governmental immunity, the absence of any argument concerning the parameters of the Town's waiver of governmental immunity, and the fact that Swick has identified a genuine dispute of material fact with respect to his malicious prosecution claim against Wilde, the court will deny Defendants' motion for summary judgment as to the Town of Chapel Hill and Wilde.[34] However, because Mason, Vereen, and Blue are entitled to public official immunity, Defendants' motion for summary judgment with respect to Swick's malicious prosecution claim will be granted as to them.

### 2. Obstruction of Justice (Eleventh Cause of Action)

Swick also charges Defendants with obstruction of justice and conspiracy. "Obstruction of justice is a common law offense

---

[34] This ruling does not preclude the Town of Chapel Hill from raising its governmental immunity defense upon the showing of lack of insurance coverage.

in North Carolina." <u>In re Kivett</u>, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983). State law defines it as "an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice." <u>Blackburn v. Carbone</u>, --- N.C. App. ---, ---, 703 S.E.2d 788, 794 (2010) (citation and internal quotation marks omitted).

The North Carolina General Assembly has codified a number of laws identifying different obstruction violations, including, perhaps most analogously to the facts of this case, falsifying reports to law enforcement agencies or officers. N.C. Gen. Stat. § 14-225. Section 14-225 of the North Carolina General Statutes makes it illegal for any person to "willfully make or cause to be made to a law enforcement agency or officer any false, misleading or unfounded report, for the purpose of interfering with the operation of a law enforcement agency, or to hinder or obstruct any law enforcement officer in the performance of his duty." <u>Id.</u> According to the North Carolina Court of Appeals, the intent of the law is to "deter only the type of false report that is designed to confound a police investigation or otherwise squander precious law enforcement resources." <u>State v. Dietze</u>, 190 N.C. App. 198, 201, 660 S.E.2d 197, 199 (2008). Assuming without deciding that such a claim may even be brought against a law enforcement officer under the circumstances of this case, Swick has pointed to no evidence

that Wilde's purpose in seeking Swick's arrest was to hinder or obstruct other law enforcement officers in the performance of their duties. Cf. id.

In addition, even if Swick were to proceed under the common-law tort of obstruction of justice, his claim would fail. North Carolina's courts do not recognize claims alleging a conspiracy to provide false testimony in order to secure an individual's arrest. Strickland v. Hendrick, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72-73 (2008). The only North Carolina state decision Swick cites in favor of his claim involved the creation of false documents and destruction of relevant records. See, e.g., Henry v. Deen, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984). However, no documents are alleged to have been fabricated or destroyed in this case. Swick's other cases involved attempts to delay a trial or influence the testimony of witnesses in judicial proceedings, see, e.g., Reed, 241 F. App'x at 928 (citing cases), but no similar allegations have been made here. Instead, the basis for Swick's claim appears to be Wilde's alleged oral misrepresentations to the magistrate in seeking Swick's arrest. But, North Carolina's courts do not recognize a civil cause of action for perjury, Henry, 310 N.C. at 88-89, 310 S.E.2d at 335, so any aspect of Swick's claim based on Wilde's sworn statements is without merit. As a

result, Defendants are entitled to summary judgment on Swick's obstruction of justice claim.

### 3. Negligent and Intentional Infliction of Emotional Distress Claims (Twelfth and Sixteenth Causes of Action)

Swick's next claims are for intentional infliction of emotional distress (IIED) and conspiracy to inflict severe emotional distress against each Defendant, save for Blue; and negligent infliction of emotional distress (NIED) against the Town of Chapel Hill based on the official conduct of its employees. (Doc. 1 at 69, 83.) In his brief, however, Swick seems to abandon these claims, stating that his "claims for emotional distress can also be dismissed to the extent that the relief sought in those claims overlaps with relief for emotional harms that Plaintiff is entitled to under his state and federal claims that are going forward to trial." (Doc. 32 at 29.) To the extent Swick intends any portion of his emotional distress claims to go forward, the claims are without merit.

The elements of IIED are (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another. <u>Dickens v. Puryear</u>, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). NIED, on the other hand, requires a showing that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress

. . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). "Severe emotional distress," therefore, is an element of both claims, see Holloway v. Wachovia Bank & Trust Co., N.A., 339 N.C. 338, 354, 452 S.E.2d 233, 242-43 (1994) (explaining that the "severe emotional distress required for IIED is the same as that required for negligent infliction of emotional distress"), and North Carolina's courts have interpreted the term to mean "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depressions, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." McAllister v. Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 583 (1998) (citation and internal quotation marks omitted).

Here, Defendants correctly point out that Swick has made no showing of severe emotional distress. (Doc. 29 at 26.) In his deposition, Swick testified that he has not sought treatment for any physical injuries or condition arising from these incidents. (Doc. 26-1 at 63.) More importantly, he has not sought therapy, psychological treatment, or psychiatric treatment and has had no health problems as a result of anything alleged in his complaint. (Id.) Taking these statements in conjunction with

Swick's brief, Defendants are entitled to summary judgment on Swick's IIED and NIED claims.

### 4. Negligence Claims (Thirteenth, Fourteenth, and Fifteenth Causes of Action)

Swick also raises claims of negligence; negligent hiring and retention; and negligent supervision, discipline, and training against the Town of Chapel Hill based on the official conduct of its employees acting in their official capacities.[35] (Doc. 1 at 73-83.) Defendants move for summary judgment as to these claims, alleging that Swick has pointed to no evidence to support them. (Doc. 29 at 24-25.)

To state a claim for negligence in North Carolina, "a plaintiff must allege: (1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Fussell v. N.C. Farm Bureau Mut. Ins. Co., 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010) (citation omitted). To succeed on a specific claim of negligent hiring, retention, or supervision, the plaintiff must prove: (1) the specific negligent act on which the action is founded; (2) "incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred"; (3) the employer's actual or constructive notice of the employee's incompetence; and (4) "that the injury complained of resulted from the incompetency proved." Medlin v.

_____
[35] Swick has dropped his negligence claims against Mason and Wilde. (Doc. 32 at 27.)

80

Bass, 327 N.C. 587, 590-91, 398 S.E.2d 460, 462 (1990) (citation omitted); see also Foster v. Nash-Rocky Mount Cnty. Bd. of Educ., 191 N.C. App. 323, 330, 665 S.E.2d 745, 750 (2008). North Carolina's courts also recognize claims of negligent training based on the general elements of negligence. See Floyd v. McGill, 156 N.C. App. 29, 35-36, 575 S.E.2d 789, 793-94 (2003).

Here, Swick's negligence claims fail. The court's finding that Swick's May 20 arrest was supported by probable cause precludes any basis for claims based on that arrest. In addition, Swick's claims that the Town of Chapel Hill failed to adequately train its police force on the First Amendment's limitations on law enforcement are meritless for at least two reasons. First, the bulk of Swick's evidence related to the inadequacy of the Town's First Amendment training comes from Mason's apparent unfamiliarity with the Amendment, but this evidence is immaterial because she had no official involvement in Swick's May 27 arrest. Second, Wilde, the only officer whose training could have led to a First Amendment violation, explains that he received "constitutional law" training at the police academy (in Greensboro) and that his role as a police officer is to "ensure [private citizens'] freedom of speech, unless they are violating some sort of state, federal, or local statute." (Doc. 26-5 at 42.) Given Wilde's training in constitutional law

and his understanding of the First Amendment, the court cannot say that Swick has created a genuine dispute of material fact of whether Chapel Hill's First Amendment training -- even if inadequate -- was a proximate cause of Swick's arrest. Cf. Fussell, 364 N.C. at 226, 695 S.E.2d at 440 (2010) (explaining that proximate causation is an element of negligence).

Similarly, the evidence fails to support Swick's claims that the Town negligently trained its police officers in probable cause standards. Despite Swick's naked assertion to the contrary, it is clear that each officer received probable cause training in the police academy (Doc. 26-3 at 16) and received periodic instruction related to the elements of specific crimes while on the Chapel Hill police force (Doc. 26-5 at 39). Moreover, Mason and Wilde both understood probable cause to mean, if anything, something equally as stringent as that typically required to justify an arrest. Compare id. at 39-40 (explaining that probable cause arises in Wilde's view when the elements of a crime are met "and you've got a person that probably did [the crime]"), and Doc. 26-3 at 15-16 (noting that Mason understands probable cause to mean "beyond the shadow of a doubt that . . . the elements of the charge exist and are true" or at least that the charging officer is "pretty sure that all the elements of a crime exist" and, in any event, that "probable cause is more than reasonable suspicion"), with

Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, . . . and that the belief of guilt must be particularized with respect to the person to be searched or seized." (alterations, citations, and internal quotation marks omitted)). Finally, Swick points to no evidence supporting his negligent hiring or retention claims, and none appears in the record.

Because Swick has not demonstrated a genuine dispute of material fact related to his negligence causes of action, Defendants are entitled to judgment as a matter of law on them.

### 5. Violations of the North Carolina Constitution (Seventeenth Cause of Action)

Finally, Swick contends that Defendants deprived him of his rights under the North Carolina Constitution under (at least) Article I, sections 1, 19, and 20. (Doc. 1 at 83-84.) Generally speaking, sections 1, 19, and 20 provide that all individuals are created equal, afford people the equal protection and due process of the State's laws, and prohibit the issuance of general warrants, respectively. N.C. Const. Art. I §§ 1, 19, 20. Defendants contend that summary judgment on Swick's constitutional claims is proper because no evidence exists in support of them and because direct actions under North

83

Carolina's constitution are only permitted in the absence of an adequate state remedy. (Doc. 29 at 26.)

In North Carolina, where a plaintiff lacks an "adequate remedy at state law," he may bring a direct claim under the State Constitution; otherwise, direct constitutional claims are barred. See Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 342, 678 S.E.2d 351, 356-57 (2009). "An adequate state remedy exists if, assuming the plaintiff's claim is successful, the remedy would compensate the plaintiff for the same injury alleged in the direct constitutional claim." Estate of Fennell ex rel. Fennell v. Stephenson, 137 N.C. App. 430, 437, 528 S.E.2d 911, 915-16 (2000), rev'd in part on other grounds, 354 N.C. 327, 554 S.E.2d 629 (2001). Put another way, "a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Craig, 363 N.C. at 339-40, 678 S.E.2d at 355. Direct constitutional claims, therefore, protect a plaintiff's right to redress when doctrines like sovereign immunity preclude the possibility of common law remedies. See id. at 342, 678 S.E.2d at 356-57.

Here, Swick has alleged a number of state law claims. As explained above, his malicious prosecution claim -- at least to the extent it is related to his May 27 arrest -- may proceed, which, of course, grants him an adequate remedy for any injury he suffered as to that incident. Swick's other state law

84

claims, however, are barred not through doctrines of immunity or other similar doctrines, but because they are meritless. <u>See Edwards v. City of Concord</u>, 827 F. Supp. 2d 517, 523-24 (M.D.N.C. 2011) (recognizing that North Carolina courts have not found that an available claim fails to provide an adequate remedy merely because a plaintiff is unable to meet his factual proof). As a result, Defendants are entitled to judgment as a matter of law on Swick's constitutional claims.

## III. CONCLUSION

For the reasons stated above,

IT IS THEREFORE ORDERED as follows:

1. Defendants' motion for summary judgment (Doc. 26), as it arises out of the May 27 incident and is based on Swick's Fourth Amendment unreasonable seizure claim (first cause of action), First Amendment retaliation claims (second and third causes of action), and Fourteenth Amendment evidence fabrication claim (fourth cause of action), is DENIED as to Defendant Wilde.

2. Defendants' motion for summary judgment (Doc. 26), as it arises out of the May 27 incident and is based on Swick's state law malicious prosecution claim (tenth cause of action), is DENIED as to Defendants Wilde and the Town of Chapel Hill.

3. In all other respects, Defendants' motion for summary judgment (Doc. 26) is GRANTED, and all other claims are DISMISSED.

/s/ Thomas D. Schroeder<br>
United States District Judge

August 31, 2012